UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

| | |
|---|---|
| GLIDEDOWAN, LLC D/B/A ALL-AMERICAN HOMECARE AGENCY, INC., | **COMPLAINT** |
| Plaintiff, | **JURY TRIAL DEMANDED** |
| -against- | Case No. 24-6731 |
| NEW YORK STATE DEPARTMENT OF HEALTH and JAMES V. MCDONALD, IN HIS OFFICIAL CAPACITY AS COMMISSIONER OF THE NEW YORK STATE DEPARTMENT OF HEALTH, | |
| Defendants. | |

Plaintiff, Glidedowan, LLC d/b/a All-American Homecare Agency, Inc. ("Plaintiff" or "AAHC"), by and through its attorneys, Bond, Schoeneck & King PLLC, for its Complaint against the New York State Department of Health ("DOH"), and James V. McDonald, in his official capacity as Commissioner of the New York State Department of Health (referred together as "Defendants"), respectfully states and alleges as follows:

## PRELIMINARY STATEMENT

1.  AAHC seeks to enjoin the implementation of a new scheme for the delivery of services in the New York State Consumer Directed Personal Assistance Program ("CDPAP") that would replace all current providers of Fiscal Intermediary ("FI") services with one sole FI provider throughout the State of New York

2.  FIs provide critical assistance to chronically ill, physically disabled and/or otherwise eligible individuals who self-direct their home care in CDPAP.

3.  The objective of CDPAP is to allow individuals with disabilities the ability to self-direct their home care and avoid institutionalized care.

4.      Currently, CDPAP participants can choose from among hundreds of qualified FIs approved by the State of New York. The Consumers are free to change FIs at any time, thereby assuring that FIs consistently perform to the best of their abilities.

5.      Under the new scheme, all of these FIs—for-profit and not-for-profits alike—would be forbidden from delivering FI services effective April 1, 2025. Many, if not most FIs—like plaintiff AAHC, will be put out of business altogether and their employees let go.

6.      Current FIs, including plaintiff AAHC, will be replaced by a single statewide FI from outside of New York State that lacks any ties to the communities it will serve.

7.      Consumers will no longer be able to choose their own FIs.

8.      The statutory changes were made in a closed-door deal as budget negotiations between the Governor and the Legislature came to an end, avoiding public scrutiny or input. The deal exempted the contract award for the single statewide FI from Office of State Comptroller Review, inviting backdoor dealing in the selection process, and stacked the selection criteria in favor of an out-of-state, union-friendly provider.

9.      Defendants' scheme is unlawful, unconstitutional, and confiscatory.

10.      AAHC seeks to enjoin Defendants from interfering with AAHC's FI contracts and relationships as part of Defendants' plan to impose a single statewide FI. AAHC also seeks a declaration that Defendants, in their implementation of this radically different CDPAP scheme, are violating the constitutional rights of AAHC, including its rights under the Equal Protection, Due Process, Takings, Contracts, Commerce, and Bill of Attainder Clauses.

11.      Finally, in the event injunctive relief is not granted and the new CDPAP statutory scheme is implemented, AAHC seeks just compensation for the elimination and destruction of its business.

**PARTIES**

12.     Plaintiff AAHC, is a CDPAP FI, operating pursuant to § 365-f of the New York Social Services Law and 18 NYCRR § 505.28. Its principal place of business is located at 742 North Clinton Avenue, Rochester, New York 14605.

13.     Upon information and belief, Defendant DOH is the single state agency responsible for administration of the New York State Medicaid Program and of CDPAP. Its principal place of business is located at Corning Tower, Empire State Plaza, Albany, New York 12237.

14.     Upon information and belief, Defendant James V. McDonald, M.D. is the current Commissioner of the DOH, with an office for the conduct of business located at Corning Tower, Empire State Plaza, Albany, New York 12237. Defendant McDonald is sued in his official capacity.

**JURISDICTION AND VENUE**

15.     This Court has jurisdiction pursuant to 28 U.S.C. § 1331 and 42 U.S.C. § 1983 over Plaintiff's federal constitutional claims. This Court also has jurisdiction by virtue of 28 U.S.C. §§ 1343, 2201, and 2202.

16.     Venue is proper because the violations of Plaintiff's rights have occurred, or will occur, in the judicial district.

**THE CONSUMER DIRECTED PERSONAL ASSISTANCE PROGRAM**

17.     CDPAP is a home care program designed to allow Medicaid beneficiaries "who are chronically ill and/or physically disabled" and who are otherwise eligible for home care to self-direct their own home care. It is codified at New York Social Services Law § 365-f. The implementing regulations are set out in 18 NYCRR § 505.28.

18.     For several reasons, including the ability of participants to recruit their own home care workers, participation in CDPAP reduces the risk of institutionalization.

19.    The Supreme Court held in *Olmstead v. L.C.* that the "unjustified institutional isolation of persons with disabilities is a form of discrimination[1]."

20.    CDPAP is available only to New York Medicaid beneficiaries. Medicaid is a joint federal and state program established in Title XIX of the Social Security Act (the "Medicaid Act"). The Medicaid Act is funded by a combination of both state and federal monies. In order to receive federal financial participation, each participating state must comply with the pertinent federal statutory and regulatory requirements.

21.    The federal requirements, among other things, serve to ensure that Medicaid beneficiaries' best interests are being protected. These requirements guard against fraud, waste, abuse, arbitrary state action.

22.    As a condition of participation, each state needs to submit a Medicaid Plan to the Center for Medicaid Services ("CMS") for CMS approval and amend it when changing the state's Medicaid program requirements. 42 C.F.R. § 430.10 *et seq.*

23.    In 2012, the DOH made CDPAP a Medicaid Managed Care benefit. Under Medicaid Managed Care, health insurers contract with the DOH to provide and manage contracted Medicaid benefits to New York Medicaid beneficiaries. Managed care is intended to improve health care outcomes and to more efficiently manage program costs.

24.    Since becoming a Medicaid Managed Care benefit in 2012, participation in CDPAP has grown rapidly. Upon information and belief, fewer than 15,000 Medicaid beneficiaries participated in CDPAP before 2012. According to the DOH, approximately 280,000 Medicaid beneficiaries participate in CDPAP today.

---

[1] *Olmstead v. L.C*, 527 U.S. 581, 600 (1999)

25.    Upon information and belief, the contracted health insurers, referred to as Medicaid Managed Care Organizations ("MMCOs"), have encouraged their insureds to participate in CDPAP because an hour of CDPAP home care costs less than an hour of home care provided by other home care providers, typically Licensed Home Care Services Agencies ("LHCSA's").

26.    Medicaid beneficiaries have preferred CDPAP for two primary reasons. First, the ability to manage their own care means that the participating beneficiaries control their own schedules and care. Beneficiaries can schedule their home care workers when the beneficiaries will find them the most useful, to perform services in the way that beneficiaries prefer, rather than at the times when home care agencies have staff available performing services in the way the home care agencies prefer. Second, CDPAP participants may choose their Personal Assistants, who may be friends or family members. This leads to greater comfort levels and more reliability in the workforce. By contrast, home care agencies assign staff with no consumer choice.

27.    Because of the growth of CDPAP since its inclusion in Managed Care, New York State government over the last several years has attempted to curtail CDPAP growth, not by removing CDPAP from Managed Care, but by limiting the number of FIs. As a part of the Fiscal Year 2020 Budget, the State Legislature required the DOH to conduct a Request for Offers, and to choose the FIs that could continue to perform as FIs. 2020 N.Y. Laws 410-11. Under the required RFO (RFO # 20039), the DOH selected sixty-eight FIs which would be able to continue to provide FI services. New York State Department of Health, RFO 20039: New York State Fiscal Intermediaries for the Consumer Directed Personal Assistance Program,  https://www.health.ny.gov/funding/rfo/inactive/20039/docs/awardees_names_and_counties.pdf (accessed Dec. 13, 2024). Legislative dissatisfaction with the DOH's conduct of the RFO resulted in further legislative action that increased the number of selected FIs to over 170. 2022 N.Y. Laws 773..

28.     The DOH, however, never completed the process envisioned by the 2019 legislation. 2019 N.Y. Laws 415-16. It has been abandoned in favor of the statutory enactment challenged in this action.

29.     Even with its failings, the 2019 RFO process was different than the process challenged here. The 2019 RFO resulted in multiple FIs. The statute continued the requirement that the State Comptroller, a separately elected constitutional officer of the State, review any awarded contracts prior to the contracts becoming effective. *See* 2024 N.Y. Sess. Laws Ch. 57; *see also* State Fin. Law § 163. In fact, the statute directed that any protests to the contracting process be made to the Comptroller. *Id.* Further, the statute did not exempt the RFO process from the procurement provisions of the State Finance Law. By contrast, section 163 of the New York State Finance Law was specifically made inapplicable to the current procurement process.

## CDPAP OPERATIONS

30.     CDPAP recipients are referred to as "Consumers." 18 NYCRR § 505.28(b)(1).

31.     CDPAP allows these Consumers "greater flexibility and freedom of choice" in the management of their own home health services, including the selection of FIs. *See* N.Y. Soc. Servs. Law § 365-f(1); 18 NYCRR § 505.28(a).

32.     Consistent with the purpose of giving Consumers flexibility and freedom of choice, Consumers are required to manage their own home health care aides (referred to as "Personal Assistants") and recruit, train, schedule and supervise their Personal Assistants. *See* New York Soc. Servs. Law § 365-f(3).

33.     According to the DOH, there are approximately 280,000 Medicaid Beneficiaries currently enrolled in CDPAP. According to the DOH, those Consumers employ approximately 300,000 Full-time equivalent Personal Assistants.

34.     Consumers must go through a lengthy assessment and authorizations process (18 NYCRR §§ 505.28(d) and (e)) performed by either the local Department of Social Services ("DSS") or a Medicaid Managed Care Organization ("MMCO") before the Consumer may enroll in CDPAP.

35.     That assessment and authorization process determines Consumer eligibility as well as the number of hours per week of CDPAP services that a Consumer may receive.

36.     FIs are not involved in the assessment and authorization process.

37.     Once a Consumer is determined to be eligible for CDPAP services, the Consumer chooses an FI.

38.     At a minimum, FIs provide support services to the Consumers as set forth in DOH regulations. *See* 18 NYCRR § 505.28(j). These services include:

      A.     Ensuring the health status of the Consumer Directed Personal Assistant prior to their delivery of service to the Consumer, and on an annual basis thereafter. *See* 18 NYCRR § 505.28(j)(i)-(ii);

      B.     Managing each Personal Assistant's wages and benefits, processing income tax withholdings, complying with applicable workers compensation, disability and unemployment insurance requirements. *See id.* § 505.28(j)(i);

      C.     Maintaining personnel records for each Personal Assistant, including wage and benefit records and the required medical documentation. *See id.* § 505.28(j)(iii);

      D.     Maintaining records for each Consumer, including all documentation regarding the local DSS or MMCO authorizations for home health care. *See id.* § 505.28(j)(iv);

E.      Monitoring the Consumer's ability to fulfill his or her responsibilities under CDPAP and notifying the proper DSS or MMCO of any circumstances which may affect the Consumer's ability to meet those responsibilities. *See id.* § 505.28(j) (v);

F.      Entering into contracts with regional DSS agencies and MMCOs covering its FI services, circumstances which may affect the Consumer's ability to meet those responsibilities. *See id.* § 505.28(j)(vii); and

G.      Entering into a Memorandum of Understanding with each Consumer, identifying the parties responsibilities under CDPAP, circumstances which may affect the Consumer's ability to meet those responsibilities. *See id.* § 505.28(j)(viii).

39.    AAHC provides services beyond the regulatory minimum which are not reimbursable, but AAHC provides them anyway.

## AAHC'S CONTRACTS

40.    Because of its exceptional performance record, AAHC has been highly sought after as a FI both by local DSS entities (each County and the City of New York is a Social Services District), and by MMCOs looking to deliver the same services on their side of the program

41.    AAHC has entered into contracts with approximately twenty Counties in Upstate New York, thereby creating perhaps the largest geographical Fee for Services footprint of any FI in New York State. AAHC serves communities from Jamestown to Watertown, including the cities of Buffalo, Rochester, and Syracuse.

42.    The population of the area served by AAHC's Fee for Service footprint alone is approximately 3.1 million and exceeds the populations of nineteen different states.

43.    No County has ever cancelled a contract with AAHC, nor has a County ever lost AAHC's services by allowing its contract to lapse.

44.    AAHC has contracts with most of the leading MMCOs. No MMCO has canceled a contract with AAHC.

45.    These contracts are vital to AAHC. AAHC relies on the funds from the contracts to pay fixed expenses (*e.g*., a long-term lease for its office space and customer parking, insurance contracts, office equipment leasing, maintenance, software usage, office cleaning and payroll processing, together with legal and accounting expenses) and to deliver FI services to chronically ill and disabled individuals.

46.    AAHC's contracts with Counties and MMCOs are its only source of revenue.

**DEFENDANTS' INTERFERENCE WITH PRIVATE CONTRACTS**

47.    The amended statute requires that MMCOs contract with the single statewide FI chosen through the RFP process. *See* N.Y. Soc. Servs. Law § 365-f(4)(4-i).

48.    The amended statute further requires that all other FIs, including AAHC, cease providing FI services as of April 1, 2025.

49.    The requirement that AAHC stop providing FI services as of April 1, 2025 prevents AAHC from fulfilling the terms of the contracts it has with MMCOs .

50.    The requirement that MMCOs contract with the single statewide FI will prevent those MMCOs from fulfilling the terms of the contracts those MMCOs have with AAHC.

**DEFENDANTS' UNLAWFUL SWITCH
TO A SINGLE STATEWIDE FI**

51.    The New York State Legislature, at the behest of Defendants, enacted amendments to Section 365-f of the New York Social Services Law. The amendments:

A.    Nullify all of the contracts FIs have with both MMCOs and Counties and forbid all FIs from providing CDPAP services effective April 1, 2025;

B.    Provide for the selection of a single statewide FI to replace all FIs located throughout the state, including AAHC;

C.    Authorize the issuance of an RFP with bidding criteria designed to disqualify all but a tiny fraction of New York State FIs from bidding, and enabling Defendants to award the statewide FI ("SFI") contract to its pre-selected, out-of-state favorite; and

D.    Exempting the contract award from approval by the State Comptroller to assure that the award could be made with minimal oversight.

**BIDDING CRITERIA TO BE THE SINGLE FI**

52.    Amended section 365-f spawned a lengthy Request for Proposals: RFP #20524 New York State Fiscal Intermediary Services, Issued: June 17, 2024, which contained "qualifications" seemingly required of all bidders, but, in fact, intended to clear the field for Defendant's favored bidder. Among the "qualifications":

A.    Bidders must have been providing statewide FI services in another state. Without statewide performance in another state, CDPAP services provided in New York State would NOT be considered, regardless of how well and for how long those services had been provided, and regardless of the geographical scope of the services provided.

B.    Bidders must "have met and will continue to meet requirements of Section 220(3-a)(a)(iii) of the New York Labor Law that sets forth the certified payrolls and obligations related to such payrolls" (RFP at 21);

C.    Bidders must comply with collective bargaining agreements (*Id*. at 7);

D.    Bidders must restrict ownership and controlling interests by prohibiting conflicts with LHCSA's *(Id.* at 8).

53.     To assure that the selection of the favored bidder, the RFP did not include a scoring system, or provide meaningful information on how offers would be scored. Even when asked, Defendant refused to make public its process for scoring the offers or for weighing the factors set forth in any application (See NYSDOH RFP # 20524, Questions and Answers, August 7, 2024, Questions 390-447). Defendant DOH retained for itself the sole and unfettered authority to choose whomever Defendant wanted, and to keep the rationale for Defendant's choice entirely secret.

54.     Despite the fact that the qualifying criteria for both bidders and subcontractors are unrelated to an entity's ability to perform the required services, and were instead tailored to suit Defendants' preselected winner, there was always a possibility that a party other than Defendants' pre-selected winner could emerge victorious under a fair and objective scoring system.

55.     So Defendants refused to make public its process for scoring the RFP bids or for weighing the factors set forth in any application (*see* NYSDOH RFP #20524, Questions and Answers, August 7, 2024, Questions 390-447). Defendants retained for themselves the sole and unfettered authority to choose whomever they wanted, and to keep the rationale for their choice entirely secret.

56.     The bidding process was rigged even before the statutory authorization was passed.

57.     From the get-go, there were press reports that the statute was being amended with the intention of awarding the contract for a single statewide FI to Public Partnerships, LLC ("PPL").

58.     PPL operates as an FI in other states on a statewide basis.

59.     PPL had a relationship with SEIU Local 1199, a highly influential health care workers union, which strongly urged the enactment of the amended statute.

60.     The RFP required that the selected awardee agree that it would be the "joint employer" of CDPAP Personal Assistants. If the single statewide FI were a "joint employer", SEIU 1199 could more easily organize Personal Assistants as SEIU 1199 members.

## RFP CRITERIA TO BE SUBCONTRACTORS

61.     The RFP requires the pre-selected winner to select subcontractors to perform FI work. The RFP imposes criteria for subcontractors unsupported by the amended statute and unrelated to the performance of subcontractor duties. Apart from Independent Living Centers, the RFP arbitrarily limited subcontractors to entities that have been providing FI services prior to 2012 and barred FIs from having an ownership relationship with LHCSAs.

62.     Despite these unlawful and unconstitutional criteria for bid award, AAHC submitted a timely bid to Defendants.

63.     AAHC is capable of providing FI services on a statewide basis in New York.

64.     Through its successful years of operation in New York as an FI, AAHC has mastered the skills necessary to be an FI and successfully support Consumers in their receipt of CDPAP services.

65.     Nevertheless, Defendants refused to consider AAHC's bid because AAHC does not operate as an FI in any other State besides New York.

## THE AWARD

66.     To no one's surprise, at approximately 8:00 am on the RFP "Decision Day", September 30, 2024, Governor Kathy Hochul's office issued a press release announcing the winner of the rigged RFP process. As had been widely reported in the media weeks and months before, the award went to PPL, a unionized company based in Georgia.

67.    In fact, in a meeting with advocates for those with disabilities on April 10, a member of the Governor's Office of the Chief Disability Officer stated that PPL would be the awardee.

68.    The Governor's announcement simply confirmed what had already been decided months before.

69.    In fact, PPL was so sure that it would be given the contract award, PPL had begun advertising for a director to operate the New York single statewide FI more than a month before the Governor's press release announcing the award to PPL.

70.    Despite the fact that RFP "Decision Day" was but minutes old, Governor Hochul's press release contained quotes from the representative of PPL, and a declaration that PPL would move its headquarters from Georgia to New York State.

71.    The press release also included laudatory quotes from a representative of SEIU Local 1199.

72.    Upon information and belief, SEIU 1199 has repeatedly expressed its strong to desire to unionize the statewide network of CDPAP homecare workers.

73.    Upon information and belief, organizing a single FI would be substantially easier for SEIU 1199 than organizing several hundred separate entities spread across the state.

74.    Upon information and belief, SEIU 1199 has for many decades regularly endorsed candidates for the New York State Legislature and for Governor, including Governor Hochul.

75.    Upon information and belief, SEIU 1199 has donated significant sums of money and hours upon hours of campaign labor to its endorsed candidates in New York State, including Governor Hochul.

76.    SEIU 1199 strongly supported the statutory amendments and the selection of PPI, an entity that SEIU 1199 concluded would be receptive to organizing.

77.    Upon information and belief, Defendant pre-selected PPL on the condition that PPL would make little or no effort to oppose unionization by SEIU 1199 of its New York State operations.

78.    SEIU 1199 was so sure that PPL would be selected that on June 20, 2024, one day before the RFP was issued and three months before the award was announced, SEIU 1199 invited FIs with which SEIU 1199 had relationships to a meeting to discuss PPL as the single statewide FI.

79.    SEIU 1199 was not alone in this belief. Legislative staffers talked openly about PPL as the presumptive awardee as the statutory amendments were negotiated.

80.    In a tweet issued the same day as the Governor's announcement of PPL's award, Manhattan State Senator Brad Hoylman-Sigal stated: "Looking forward to working with @1199SEIU to ensure this plan is successful." *See* Empire Justice Center, B. Hammond, Hochul's CDPAP Overhaul Hands a Costly Win to 1199, October 2, 2024.

## PPL'S QUESTIONABLE TRACK RECORD

81.    Despite the preselection of PPL to serve as the statewide FI, PPL is manifestly unqualified to provide the required services. It has not performed FI services meeting the statutory New York definition, and it has a history of poor performance.

82.    The statutory definition, which remained unchanged by the statutory amendments, states that FI services are those items listed in Social Services Law 365-f(4-a)(a)(ii).

83.    No other state defines FI services in the same way as New York.

84.    In order to award the single statewide FI contract to PPL, Defendant had to waive or ignore the New York statutory definition, as PPL was not performing FI services as defined by the governing New York statute in another state.

85.     In response to questions from prospective bidders, defendant stated that the DOH would in fact ignore the statutory definition, thereby accepting services "similar" to New York FI services in order to permit its favored bidder to prevail.

86.     PPL's track record clearly establishes that it was not chosen for its history of performance. Consider:

A.      Upon information and belief, a 2013 review of PPL's work for Pennsylvania found that there were "significant red flags" indicating that PPL was not prepared to take over there, leading to lapses in caregivers being paid;

B.      Upon information and belief, PPL was sued as part of a class action case filed in the Eastern District of Pennsylvania involving more than 20,000 home care workers (*Talarico v. Public Partnerships, LLC*, No. 17-2165);

C.      PPL has lost or has not had its contracts renewed in the states of New Jersey, Washington, West Virginia, Virginia, and Tennessee. (By contrast, Plaintiff has never had a contract cancelled or not renewed).

## PPL'S SUBCONTRACTS

87.     Once publicly selected, PPL, with the DOH's approval, began to ignore the RFP's requirements, just as it was able to do with its bid.

88.     Specifically, the DOH announced twenty-four PPL-proposed subcontractors, many of which were FIs tied to LHCSAs by ownership and/or were FIs that had begun as an FI in 2022 or later.

89.     Those abandoned RFP requirements had served their purpose, to clear the field for the selection of PPL.

## LEGISLATIVE MISGIVINGS

90.    So unlawful and unsavory has this process been that even some of the New York State Legislators who voted in favor of it have now asked the Governor to reverse course.

91.    By letter dated October 1, 2024, thirty-one Members of the New York State Assembly—all are Democrats and, upon information and belief, several are attorneys–have expressed serious doubts about the Defendants' scheme as implemented.

92.    Those Assembly Members list numerous respects in which the RFP criteria and process were unlawful, irrational, arbitrary, capricious, inequitable, and detrimental to the public good.

93.    Numerous members of Congress have expressed strong concerns and several have called for federal and state investigations into the bidding process.

94.    Among the strong objections noted:

   A.    Defendants failed to provide bidders with basic, necessary information;

   B.    Defendants failed to establish meaningful selection criteria;

   C.    Defendants' RFP exceeded and did not reflect its enabling legislation; and

   D.    Defendants' RFP contained arbitrary subcontracting requirements.

**BIPARTISAN CONGRESSIONAL CALLS FOR INVESTIGATION**

95.    Democrats and Republicans in Congress don't agree on much, but they agree that the evidence strongly indicates that the RFP process was rigged for PPL. Members of both parties in New York State's congressional delegation have called upon law enforcement to investigate the RFP process.

96.    For example, Congressman Ritchie Torres (D-NY) asked the Inspectors General for both DOH and the U.S. Department of Health and Human Services to investigate the State's

"multibillion dollar boondoggle" which attempted "to put the $9 billion CDPAP in the hands of a single out-of-state vendor with a questionable track record and to do so under false pretenses."

97.    Eight Republican congressional representatives made similar written requests of U.S. House Speaker Mike Johnson and Minority Leader Hakeem Jeffries.

**THE MOVE TO A SINGLE FI DENIES AAHC EQUAL PROTECTION OF THE LAWS**

98.    The movement to a single statewide FI has denied Plaintiff AAHC Equal Protection of the Laws.

99.    Pursuant to the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution, "[n]o State shall … deny to any person within its jurisdiction the equal protection of the laws."[2]

100.    Section 365-f and the RFP blatantly disfavor those FIs operating solely in New York and/or those operating in another state but not on a statewide basis, in favor of FIs operating in different states.

101.    Requiring bidders to be operating outside of New York, negating their experience operating within New York State, has no rational basis and serves no governmental purpose. Plaintiff has been deprived of equal protection under the law.

102.    Defendant cannot claim that it placed importance on its perception that non-New Yorkers companies would have an operational plan since Defendant never sought an operational plan as part of the RFP.

103.    An operational plan to deliver very different CDPAP services in Rhode Island or Wyoming, for example, would be of precious little value in evaluating how an agency would deliver services required by New York to the State of New York.

---

[2] U.S. Const. amend. XIV § 1.

104.    Further, the conduct of a sham RFP with the intention to award the contract to a pre-selected bidder, thereby favoring PPL over all other FIs, denied Plaintiff AAHC and all other bidding FIs the equal protection of the law. There is no rational basis to require the entity to be selected as the single FI to have experience statewide in another state. The provision of political favors is not a rational basis for governmental action. Savings are unlikely to accrue from the organization of Personal Assistants by SEIU 1199. SEIU 1199's stated purposes include raising the wages and benefits of its members.

105.    The FI services are to be provided in New York State. Whether experience is statewide is irrelevant to whether an FI can succeed in New York.

106.    There is nothing to suggest that statewide experience in another state will result in a lower cost for FI services in New York.

107.    Moreover, by pre-selecting the awardee, defendant has denied plaintiff AAHC a fair opportunity to compete. The denial of an equal chance is a denial of the equal protection of the laws.

108.    The movement to a single statewide FI will not lessen the likelihood of fraud. In fact, an FI monopoly increases the likelihood that fraud will go unaddressed.

109.    Despite Governor Hochul's claims that CDPAP is "one of the most abused programs in the entire history of the State of New York,"[3] the "2022 audits by the state's Medicaid Inspector General reviewed $37 million in claims—and found that 99 percent were accurate" and nearly all documented overpayments were later collected.[4]

---

[3] Disability Advocates Fear New York Will Gut a Key Home Care Program, Mother Jones, https://www.motherjones.com/politics/2024/08/disability-advocates-new-york-cdpap-hochul-home-care-fi/(last updated August 13, 2024).

[4] *Id.*

110.    Doing an end run around the Office of Comptroller's oversight and involvement has diminished the protections the State is claiming to seek.

111.    Finally with respect to fraud, smaller caseloads enable the FI's to more carefully monitor for fraud. A statewide FI simply cannot do so as effectively.

**SECTION 365-F AND THE RFP VIOLATE THE COMMERCE CLAUSE**

112.    Under the Constitution of the United States Congress is granted the power and ability to "regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes."[5] Furthermore, Congress also has the power to "regulate 'the channels of interstate commerce,' 'persons or things in interstate commerce,' and 'those activities that *substantially affect* interstate commerce.'"[6] (emphasis added).

113.    By requiring that bidders have conducted business outside of New York State, and by refusing to consider work conducted in New York, unless a bidder has been a statewide FI in another state, the RFP and Section 365-f directly and impermissibly favor non-New York enterprises.

114.    Section 365-f and the Defendants' implementation of the RFP have violated the Commerce Clause due to the favoritism they demonstrate.

**SECTION 365-F AND THE RFP VIOLATE THE CONTRACTS CLAUSE**

115.    The Contracts Clause of the United States Constitution states, in pertinent part, that "[n]o State shall . . . pass any Law impairing the Obligation of Contracts."[7]

116.    Defendants have not merely interfered with Plaintiff's private contracts with Counties and insurance companies. They has actually cancelled them.

---

[5] U.S. Const. art. I, § 8, cl. 3.
[6] *Nat. Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 536 (2012).
[7] U.S. Const. art I, § 10, cl. 1.

117.    Moreover, Plaintiff is currently bound to numerous contracts to operate its business, such as agreements with insurance companies, vendors, employees, and lessors.

118.    By nullifying Plaintiff's contracts with the Counties and insurance companies, Defendants will be depriving Plaintiff of its sole source of income. They will be unable to honor their contractual obligations in their other agreements referenced above.

## SECTION 365-F AND THE RFP ARE AN IMPERMISSIBLE BILL OF ATTAINDER

119.    The United States Constitution does not permit a state to "pass any Bill of Attainder."[8] "A bill of attainder is legislation that imposes punishment on a specific person or group of people without a judicial trial."[9] As explained by the Supreme Court, "legislative acts, no matter what their form, that apply either to named individuals or to easily ascertainable members of a group in such a way as to inflict punishment on them without a judicial trial are bills of attainder prohibited by the Constitution."[10]

120.    The implementation of Section 365-f and the RFP have stripped everything from existing FIs, including Plaintiff. Appointing PPL as the single FI means that the thousands of New Yorkers currently employed by FI companies will soon lose their jobs – without any say or justification.

## SECTION 365-F AND THE RFP VIOLATE THE TAKINGS CLAUSE

121.    Should the Court determine that Defendants have not violated any statute or Constitutional provision requiring a judicial ruling that the amendments to Section 365-f and the resulting RFP are null and void, and that Defendants scheme should be allowed to proceed as planned, Plaintiff must nevertheless be compensated for the government's taking of its property.

---

[8] U.S. Const. art. I, § 10, cl. 1.
[9] *Id.*; *see Nixon v. Adm'r of Gen. Servs.*, 433 U.S. 425, 468 (1977).
[10] *United States v. Lovett*, 328 U.S. 303, 315 (1946).

122.    The enactment of a law which declares all of Plaintiff's contracts a nullity, and which prohibits Plaintiff from providing the services that generate its only source of revenue, is a taking per se.

123.    It is a total taking, requiring just compensation.

### COUNT I
### Equal Protection Clause – Fourteenth Amendment; 42 U.S.C. § 1983

124.    Plaintiff repeats and re-alleges each and every allegation contained in the preceding paragraphs as if fully set forth herein.

125.    The Equal Protection Clause of the Fourteenth Amendment of the United States Constitution protects individuals and groups from laws which deprive them of equal protection. [11]

126.    Acting under the color of state law, Defendants have caused, and will continue to cause, Plaintiff and other FIs to be dispossessed of their right to equal protection guaranteed to them by the Fourteenth Amendment, both facially and as applied to Plaintiff.

127.    Defendants imposed requirements that bidders must meet in order to be eligible for the SFI contract. Those requirements single out agencies like Plaintiff that provide FI services exclusively in New York.[12] Such discrimination renders these FIs categorically ineligible to serve as the SFI. Yet, entities with out-of-state operations were given definitive preference – even those entities that have never operated or provided FI services in New York.

128.    Plaintiff is situated similarly positioned to those entities that are operating on a statewide basis outside of New York in all pertinent aspects.

129.    There is no rational relationship between a legitimate government interest and giving preferential treatment to out-of-state operating FIs. The intent of such favorable treatment to

---

[11] U.S. Const. amend. XIV, § 1.
[12] *See Crowley v. Courville*, 76 F.3d 47, 52-53 (2d Cir. 1996); *LaTrieste Rest. & Cabaret v. Vill. of Port Chester,* 40 F.3d 587, 590 (2d Cir. 1994).

out-of-state operating FIs was to reduce the number of eligible bidders, making it easier for De-fendants to select PPL as the State monopolist.[13] Indeed, FIs operating in New York are actually *better* situated to serve Consumers, as they have built years of rapport with Consumers and are intimately connected to the CDPAP system.

130.    The requirement that bidders operate outside of New York serves no rational pur-pose. An entity operating on a statewide basis elsewhere could be providing different FI services to fewer Consumers than an FI company operating only in New York.

131.    Defendants' RFP does not require a minimum number of Consumers served, nor the type of services provided. All that is required is for eligible bidders to be operating on a statewide basis. A New York FI serving much of New York City, or one serving all of upstate, may well be more qualified than an agency serving all of Rhode Island or Idaho, for example.

132.    A bona fide and actual controversy exists in that Plaintiff alleges that the enactment of the CDPAP amendments violate the Equal Protection Clause of the Fourteenth Amendment to the Constitution of the United States, both facially and as applied to Plaintiff.

133.    Plaintiff desires a judicial determination of the validity of the CDPAP amendments to save themselves, and other FIs, from the irreparable harm caused by the enactment of the amend-ments made to § 365-f, which deprives Plaintiff of the benefit of its existing contracts and arbitrar-ily disqualifies them from serving as the SFI. The enactment of the amendments made to CDPAP result in substantial hardship to Plaintiff.

134.    The judicial determination ruling the amendments to CDPAP unconstitutional is necessary and appropriate to avoid the denial of constitutional rights—guaranteed to Plaintiff as a

---

[13] *Id.*

citizen of the United States—that result from implementing and enforcing the amendments made to CDPAP on Plaintiff and other FIs alike.

135.    By reason of the foregoing, Defendants' actions are in violation of the Equal Protection Clause of the United States Constitution, both facially and as applied to Plaintiff. Defendants should be enjoined from taking further action in implementing PPL as the SFI, and the Court should issue an order declaring the amendments to Section 365-f invalid. If not, Plaintiff will continue to be irreparably harmed and subjected to the deprivation of rights guaranteed to it by the United States Constitution.

### COUNT II
### Contracts Clause – Article I, § 10; 42 U.S.C. § 1983

136.    Plaintiff repeats and re-alleges each and every allegation contained in the preceding paragraphs as if fully set forth herein.

137.    Acting under the color of state law, Defendants have caused, and will continue to cause, FIs, such as Plaintiff, to be deprived of their rights guaranteed to it by the Contracts Clause, both facially and as applied to Plaintiff.

138.    The amendments to CDPAP, specifically to § 365-f, will cancel the contractual relationships and obligations that Plaintiff and other FIs currently have. As of April 1, 2025, FIs will be forced to stop performing under their existing contracts with MMCOs, vendors, unions, insurance companies, and employees currently working in CDPAP. Prior to Defendants enacting the amendments to CDPAP, Plaintiff willfully entered into voluntary contracts to which it had the reasonable expectation of receiving compensation in exchange for providing FI services to Consumers.

139.    The contracts entered into by Plaintiff will be completely nullified. The amendments made to the Program destroy the material aspects of these contracts, impede the contracting parties' reasonable expectations, and prevents FIs, such as Plaintiff, from preserving their rights.

140.    Upon entering into such contractual relationships FIs reasonably expected such revenue streams to flourish and grow, as they had been for nearly all the years of CDPAP. However, by prohibiting Plaintiff from providing FI services, the amendments to CDPAP will disrupt, or rather crush, any reasonable expectations or income streams under those contracts, on which Plaintiff reasonably relied on in structuring and investing in its business.

141.    At the time that Plaintiff entered into these contractual relationships it could not foresee such devastating and drastic measures that Defendants took by implementing the changes to CDPAP. There were no warnings or telltale signs of the possibility that Defendants might implement such an abrupt, and irrational change that would lead to the closure and elimination of nearly 600 FI agencies.

142.    As previously discussed, there is no legitimate public purpose underpinning the amendments to CDPAP that could withstand the constitutional scrutiny under the Contracts Clause.

143.    Rather than implementing additional regulations to oversee the Program and cut down on the "fraud and waste" alleged by Defendants, the State and Defendants chose to eliminate all 600 New York FIs and replace them with PPL—a hand-picked government-endorsed monopoly which must now root out alleged fraud in cases throughout the state all by itself.

144.    The decision to use a single FI, PPL, does not benefit the Consumers. Rather, the only parties benefiting from this decision are PPL, SEIU 1199, and the politicians SEIU 1199 supports. Consumers and the public as a whole will be harmed by reducing the number of FIs they can select from, which will in turn diminish the level and quality of care they receive.

145.    As stated above, if Defendants truly wished to retain more control over the Program and further the Program's purposes, then they could have done so in a much less destructive way. Rules and regulations could have been implemented to provide the State and Defendants with such control. This would have been a rational way to achieve a legitimate public purpose. However, the State and Defendants chose to eviscerate an entire private industry and the contracts involved in it. This exemplifies an unreasonable and unnecessary means of achieving a legitimate purpose, or any such purpose for that matter.

146.    Once PPL has officially taken over as the SFI, expected April 1, 2025, Plaintiff will be prevented from ever reinstating its contractual rights. In furtherance of this issue, Plaintiff also has no hope to recover the revenue they will lose from the contracts that will be terminated in which they reasonably relied upon.

147.    A bona fide and actual controversy exists in that Plaintiff alleges that the enactment of the CDPAP amendments violate the Contracts Clause of the Constitution of the United States, both facially and as applied to Plaintiff.

148.    Plaintiff desires a judicial determination of the validity of the CDPAP amendments to save themselves, and other FIs, from the irreparable harm caused by the enactment of the amendments made to § 365-f, which deprives Plaintiff of the benefit of its existing contracts. The enactment of the amendments made to CDPAP result in substantial hardship to Plaintiff.

149.    The judicial determination ruling the amendments to CDPAP unconstitutional is necessary and appropriate to avoid the denial of constitutional rights—guaranteed to Plaintiff as a citizen of the United States—that result from implementing and enforcing the amendments made to CDPAP on Plaintiff and other FIs alike.

150.    By reason of the foregoing, Defendants' actions are in violation of the Contracts Clause of the United States Constitution, both facially and as applied to Plaintiff. Defendants should be enjoined from taking further action in implementing PPL as the SFI, and the Court should issue an order declaring the amendments to Section 365-f invalid. If not, Plaintiff will continue to be irreparably harmed and subjected to the deprivation of rights guaranteed to it by the United States Constitution.

## COUNT III
### Substantive Due Process – Fourteenth Amendment; 42 U.S.C. § 1983

151.    Plaintiff repeats and re-alleges each and every allegation contained in the preceding paragraphs as if fully set forth herein.

152.    Acting under color of state law, Defendants' amendments to CDPAP have caused, and will continue to cause, Plaintiff and other FIs to be deprived of their property without due process in violation of their substantive due process rights under the Fourteenth Amendment, both facially and as applied to Plaintiff.

153.    Under the Constitution of the United States, FIs have protected interests in operating their businesses free from unreasonable governmental interference, and to enjoy their existing various contracts. FIs are also protected by the Constitution from excessive and unreasonable government conduct intentionally directed toward them.

154.    The changes to CDPAP have interfered with these rights without rational basis. Under these changes, FIs are prevented from continuing to provide services and receive compensation under the terms of their existing contracts.

155.    The destruction of an entire private industry lacks a reasonable and nondiscriminatory legislative purpose, and does not promote public health, safety, or general welfare. Rather,

Consumers will endure disruptions in services provided to them during the implementation and transition of PPL as the SFI.

156.    Moreover, the State's and Defendants' decision use a SFI was motivated by bad faith and political gain. Defendants intentionally made the amendments to CDPAP and chose to go down to a single SFI, solely for the corrupt intention of ensuring that PPL would be awarded the nearly $9 billion contract and that SEIU 1199 would harvest union dues from hundreds of new members.

157.    A bona fide and actual controversy exists. The enactment of the CDPAP amendments violates the Due Process Clause of the Constitution of the United States, both facially and as applied to Plaintiff.

158.    Plaintiff desires a judicial determination of the validity of the CDPAP amendments to save themselves, and other FIs, from the irreparable harm caused by the enactment of the amendments made to § 365-f. The enactment of the amendments made to CDPAP result in substantial hardship to Plaintiff.

159.    The judicial determination ruling the amendments to CDPAP unconstitutional is necessary and appropriate to avoid the denial of constitutional rights—guaranteed to Plaintiff as a citizen of the United States—that result from implementing and enforcing the amendments made to CDPAP on Plaintiff and other FIs alike.

160.    By reason of the foregoing, Defendants' actions violate the Due Process Clause of the 14th Amendment to the United States Constitution, both facially and as applied to Plaintiff, the SFI, and the Court should issue an order declaring the amendments to Section 365-f and the subsequent RFP process invalid. If not, Plaintiff will continue to be irreparably harmed and subjected to the deprivation of rights guaranteed to it by the United States Constitution.

**COUNT IV**
**Taking Without Just Compensation – Fifth Amendment; 42 U.S.C. § 1983**

161.    Plaintiff repeats and re-alleges each and every allegation set contained in the pre-ceding paragraphs as if fully set forth herein.

162.    Acting under color of state law, Defendants have caused, and will continue to cause, Plaintiff, as well as other FIs, to be deprived of its property rights, and has taken their private property for a claimed public benefit without just compensation, in violation of the Takings Clause, both facially and as applied to Plaintiff.

163.    Plaintiff is currently bound to numerous voluntary contractual relationships with MMCOs, in which Plaintiff receives compensation in exchange for their ongoing provision of FI services to CDPAP Consumers. These contracts, lasting for an extended period of time, were en-tered into prior to the amendments of CDPAP being enacted.

164.    The amendments to CDPAP deprive FIs, including Plaintiff, of all economically viable or profitable use of their private property, without just compensation.

165.    As of April 1, 2025, no entity other than the SFI "shall provide, directly or through contract, fiscal intermediary services." The amendments to Section 365-f eviscerate all economi-cally beneficial uses of Plaintiff's, and other FIs, existing contracts. These contracts are rendered worthless, as FIs are banned from operating as FIs and from continuing to operate under their existing contracts. The income streams and operations of FIs have not been simply diverted by the changes to CDPAP, rather they have been utterly destroyed.

166.    A taking that deprives existing owners of all "economically beneficial uses of [their] property" is considered a *per se* regulatory taking. [14] This type of regulatory action requires

---

[14] *Id.* (*quoting Lucas v. S.C. Coastal Council,* 505 U.S. 1003, 1030 (1992)).

just compensation.[15] The amendments to CDPAP constitute a total taking of Plaintiff and FIs, and thus should be considered a *per se* regulatory taking.

167.    Moreover, the amendments to Section 365-f "go[] too far and effects a regulatory taking" based on a wide range of case-specific factors, such as, inter alia, the statute's "economic effect on the [property owners], the extent to which the [law] interferes with reasonable investment-backed expectations, and the character of the government action," that together establish that "'justice and fairness' require that the economic injuries caused by [the amendments to CDPAP] be compensated by the government, rather than remain disproportionately concentrated on [the FIs without just compensation]."[16]

168.    The changes to CDPAP the Defendants have imposed will have severe economic impacts on FIs' private property by essentially barring them from conducting their business operations. Such impacts include completely and permanently eliminating Plaintiff's contracts and business; rendering its significant investments in its business unprofitable; making it commercially impossible to continue to operate as FIs; and interfering with Plaintiff's legitimate property interests.

169.    The Defendants' interference with Plaintiff's reasonable investment backed expectations in its contracts and business is so severe that Defendants' actions are the functional equivalent of a government appropriation – without just compensation.

170.    Defendants' actions are an unconstitutional regulatory taking of private property. Neither Plaintiff nor any other New York FI has received any form of compensation for these takings.

---

[15] *See id.*
[16] *Palazzolo v. Rhode Island*, 533 U.S. 606, 617, 633 (2001) (citing *Penn Cent. Transp. Co. v. City of N. Y.,* 438 U.S. 104, 124 (1978)).

171.    A bona fide actual controversy exists in that Plaintiff alleges that the enactment of the amendments to CDPAP violate the Takings Clause of the Fifth Amendment of the Constitution of the United States, both facially and as applied to Plaintiff.

172.    Plaintiff desires a judicial determination of the validity of the CDPAP amendments to save themselves, and other FIs, from the irreparable harm caused by the enactment of the amendments made to § 365-f, which deprives Plaintiff of the benefit of its existing contracts. The enactment of the amendments made to CDPAP result in substantial hardship to Plaintiff.

173.    The judicial determination ruling the amendments to CDPAP unconstitutional is necessary and appropriate to avoid the denial of constitutional rights—guaranteed to Plaintiff as a citizen of the United States—that result from implementing and enforcing the amendments made to CDPAP on Plaintiff and other FIs alike.

174.    If the CDPAP amendments are deemed constitutional by the Court, Plaintiff desires to be fully compensated for the value of its roughly $18,000,000 business it has built. If Plaintiff is not compensated, it will continue to be irreparably harmed.

175.    By reason of the foregoing, Defendants' actions are in violation of the Takings Clause of the United States Constitution, both facially and as applied to Plaintiff. Defendants should be enjoined from taking further action in implementing PPL as the SFI, and the Court should issue an order declaring the amendments to Section 365-f invalid. If not, Plaintiff will continue to be irreparably harmed and subjected to the deprivation of rights guaranteed to it by the United States Constitution.

### COUNT V
### Commerce Clause – Article I, § 8, cl. 3; 42 U.S.C. § 1983

176.    Plaintiff repeats and re-alleges each and every allegation contained in the preceding paragraphs as if fully set forth herein.

30

177.    The amendments to CDPAP in Section 365-f impose a burden on interstate commerce that is clearly excessive in relation to the putative local benefits.

178.    Defendants imposed an undue burden on Plaintiff's ability to bid and participate in New York's economy by requiring bidders to have out-of-state experience on a statewide basis in a state other than New York. Defendants' decision to include this requirement in the RFP contains no apparent basis in law or reason and appears to only serve the purpose of unduly restricting the quantity of eligible bidders for the SFI contract.

179.    The out-of-state requirement imposed by Section 365-f substantially limits the pool of New York eligible bidders.

180.    In addition, the 365-f amendments substantially favor out-of-state FI entities.

181.    The State's law (Section 365-f) prevents hundreds of New York FIs from being eligible to bid for the SFI contract. This unduly burdens, in fact it terminates, in-state FIs from being able to submit a bid.

182.    The requirement of having out-of-state experience serves no rational basis to any legitimate governmental purpose.

183.    A bona fide actual controversy exists in that Plaintiff alleges that the enactment of the amendments to CDPAP violate the Commerce Clause of the Constitution of the United States, as applied to Plaintiff.

184.    Plaintiff desires a judicial determination of the validity of the CDPAP amendments to save themselves, and other FIs, from the irreparable harm caused by the enactment of the amendments made to § 365-f, which deprives Plaintiff of the benefit of its existing contracts and prevents it from participating in interstate commerce. The enactment of the amendments made to CDPAP result in substantial hardship to Plaintiff.

185.    The judicial determination ruling the amendments to CDPAP unconstitutional is necessary and appropriate to avoid the denial of constitutional rights—guaranteed to Plaintiff as a citizen of the United States—that result from implementing and enforcing the amendments made to CDPAP on Plaintiff and other FIs alike.

186.    By reason of the foregoing, Defendants' actions are in violation of the Commerce Clause of the United States Constitution, as applied to Plaintiff. Defendants should be enjoined from taking further action in implementing PPL as the SFI, and the Court should issue an order declaring the amendments to Section 365-f invalid. If not, Plaintiff will continue to be irreparably harmed and subjected to the deprivation of rights guaranteed to it by the United States Constitution.

### COUNT VI
### Impermissible Bill of Attainder – Article I, § 10; 42 U.S.C. § 1983

187.    Plaintiff repeats and re-alleges each and every allegation contained in the preceding paragraph as if fully set forth herein.

188.    The amendments to Section 365-f impermissibly single out groups of entities, including, among other things, those who were not performing FI services in at least one other state on a statewide basis prior to April 1, 2024, and those that have a common and/or controlling interest in LHCSAs or MMCOs.

189.    Ultimately, Defendants punished entities that were located exclusively in New York State and/or share a common interest or controlling owner with an LHCSA and/or MMCO. These restrictions serve no reasonable basis or legitimate governmental or CDPAP objective and operate to punish the specific groups noted above by purging their businesses. The nearly 600 FIs being forced to shut down were not provided with any recourse and/or provided any judicial trial or process of any kind.

190.    A bona fide actual controversy exists in that Plaintiff alleges that the enactment of the amendments to CDPAP constitute a Bill of Attainder in violation of the Constitution of the United States, both facially and as applied to Plaintiff.

191.    Plaintiff desires a judicial determination of the validity of the CDPAP amendments to save themselves, and other FIs, from the irreparable harm caused by the enactment of the amendments made to § 365-f, which deprives Plaintiff of the benefit of its existing contracts. The enactment of the amendments made to CDPAP result in substantial hardship to Plaintiff.

192.    The judicial determination ruling the amendments to CDPAP unconstitutional is necessary and appropriate to avoid the denial of constitutional rights—guaranteed to Plaintiff as a citizen of the United States—that result from implementing and enforcing the amendments made to CDPAP on Plaintiff and other FIs alike.

193.    By reason of the foregoing, Defendants' actions constitute a Bill of Attainder in violation of the United States Constitution, both facially and as applied to Plaintiff. Defendants should be enjoined from taking further action nullifying or modifying Plaintiff's FI contracts and relationships, and the Court should issue an order declaring the amendments to Section 365-f invalid. If not, Plaintiff will continue to be irreparably harmed and subjected to the deprivation of rights guaranteed to it by the United States Constitution.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in Plaintiff's favor and grant the following relief:

1.    A declaration that the recent amendments to Section 365-f of the Social Services Law violate the United States Constitution;

2.      A permanent injunction restraining and enjoining Defendants from nullifying, terminating, modifying, or interfering with Plaintiff's contracts to provide FI services in New York State or Plaintiff's relationships with recipients of services under CDPAP;

3.      Just compensation, as warranted, according to the facts of this case;

4.      An award of fees, costs, expenses, and disbursements, including reasonable attorney's fees and costs to which Plaintiff is entitled; and

5.      Such other and further relief as the Court deems necessary, equitable, just, and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38, Plaintiff demands a trial by jury in this action on all issues so triable.

Dated: December 17, 2024

**BOND, SCHOENECK & KING, PLLC**

*Edward Hourihan*

Edward P. Hourihan, Jr., Esq.
Roger A. Bearden, Esq.
Jeremy M. Sher, Esq.
*Attorneys for Plaintiff*
350 Linden Oaks, Third Floor
Rochester, New York 14625
(585) 362-4700
hourihe@bsk.com
rbearden@bsk.com
jsher@bsk.com