UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

GLIDEDOWAN, LLC d/b/a ALL-AMERICAN
HOMECARE AGENCY, INC.,

                          Plaintiff,                    **DECLARATION OF
                                                        MARCO C. ALTIERI**
        -against-
                                                         Case No. 24-6731
NEW YORK STATE DEPARTMENT OF HEALTH
and JAMES V. MCDONALD, in his official capacity
as Commissioner of the New York State Department
of Health,

                          Defendants.

_____

        Marco C. Altieri declares pursuant to 28 U.S.C. § 1746 that the following is true and

correct:

        1.      I am the Chief Executive Officer of plaintiff Glidedowan, LLC d/b/a All-

American Homecare Agency, Inc. ("Plaintiff" or "AAHC"). As such, I am fully familiar with all

of the pleadings and proceedings heretofore had herein.

        2.      I submit this affidavit in support of AAHC's motion for injunctive relief and the

and to prevent the implementation of a statutory scheme designed to put AAHC and hundreds of

other New York State Fiscal Intermediaries ("FIs") out of business.

        3.      Because this action contains unvarnished allegations of political corruption and

favoritism by Defendants, it is important to note that such claims are not the product of partisan

politics. Indeed, I am not only an enthusiastic member of the Democratic Party, I am a party

activist. I have lent tangible support to Democratic governors, Congressional representatives, and

County Executives across upstate New York.

        4.      Moreover, I have been in the home care industry for 20 years. I started out as a

home care aide, helping elderly and/or disabled people with showering and toileting. Over the

years, I have worked my way up to become part-owner and Chief Executive Officer of a pre-eminent home care agency participating in the Consumer Directed Personal Assistance Program ("CDPAP").

## Purpose of the Litigation

5.      Upon information and belief, in an effort to cater to the politically powerful and supportive Public Employee's Union, SEIU 1199, which seeks to unionize all CDPAP homecare aides ("Personal Assistants") across the state, Defendants have directed Plaintiff and hundreds of other FIs to cease providing services on or before April 1, 2025.

6.      Defendants then awarded a statewide CDPAP contract services to Defendant's single, pre-selected winner—an out-of-state company that was agreeable to seeing the Personal Assistant workforce unionized.

7.      The injunctive relief sought herein would suspend the State's directive that Plaintiff cease providing FI services by April 1, 2025.

## The Existing CDPAP

8.      CDPAP is a homecare program designed to allow certain vulnerable populations to remain at home and avoid institutional confinement. It is codified under New York Social Services Law § 365-f , which authorizes New York State Medicaid recipients who are "chronically ill and/or physically disabled" or are otherwise eligible to receive Medicaid home health services, to self-direct their own home care.[1] The Supreme Court held in *Olmstead v. L.C.*, that the "unjustified institutional isolation of persons with disabilities is a form of discrimination."[2] CDPAP has provided an avenue for states to maintain compliance with the Supreme Court's ruling.

---

[1] The eligibility requirements are set out at 18 NYCRR § 505.28(a).
[2] *Olmstead v. L.C.*, 527 U.S. 581, 600 (1999).

**CDPAP'S Governmental Background**

9.      CDPAP is a New York Medicaid program under Title XIX of the Social Security

Act (the "Medicaid Act"). The Medicaid Act is funded by a combination of both state and federal

monies. While all states do have a Medicaid program, it is not mandatory for them to participate.

New York provides personal care services as an optional state Medicaid plan service pursuant to

Section 1905(a)(24) of the Social Security Act. In order to receive federal funding each state

must comply with the pertinent federal and statutory requirements.

10.      Federal funding is used in conjunction with state funds to fund patient care. The

federal requirements serve to ensure that Medicaid beneficiaries' best interests are being

protected. These requirements guard against fraud, waste, abuse, arbitrary state action, and

ensure that the procurement process is competitive.

**CDPAP Operations**

11.      Under the New York Social Services Law, program recipients are referred to as

"Consumers." *See, e.g.*, N.Y. Soc. Servs. Law § 365-f(4-a)(a)(ii); *see also* 18 NYCRR

§ 528(b)(1).

12.      CDPAP, as currently structured, allows Consumers "greater *flexibility* and

freedom of choice" in the management of their own home health services, including the selection

of FIs. *See* 18 NYCRR §505.28(a).

13.      Consistent with the policy of giving Consumers flexibility and freedom of choice,

Consumers are required to manage their own home health care aides, referred to as Personal

Assistants, and hire and supervise these Personal Assistants. *See* N.Y. Soc. Servs. Law

§ 365-f(3).

14.     According to the DOH, there are approximately 280,000 Medicaid Beneficiaries currently enrolled in CDPAP. These Consumers are served by over 300,000 Personal Assistants and hundreds of FIs.

15.     The type of care and the number of hours needed for each Consumer are subject to an assessment and authorizations process (18 NYCRR §§ 505.28(d) and (e)) performed by either the local Department of Social Services or a Medicaid Managed Care Organization ("MMCO").

16.     After the services and the number of hours to be provided by the Personal Assistant or Assistants are determined, the Consumer chooses an FI to provide support services to the Consumers as set forth in the DOH regulations. *See* 18 NYCRR § 505.28(j). These services include:

A.     Ensuring the health status of the Consumer Directed Personal Assistant prior to their delivery of service to the Consumer, and on an annual basis thereafter. *See id.* § 505.28(j)(i)-(ii);

B.     Managing each Personal Assistant's wages and benefits, processing income tax withholdings, complying with applicable workers compensation, disability and unemployment insurance requirements. *See id.* § 505.28(j)(i);

C.     Maintaining personnel records for each Personal Assistant, including wage and benefit records and the required medical documentation. *See id.* § 505.28(j)(iii);

D.     Maintaining records for each Consumer, including all documentation regarding the local DSS or MMCO authorizations for Consumer Directed Personal Assistance. *See id.* § 505.28(j)(iv);

E.      Monitoring the Consumer's ability to fulfill his or her responsibilities under the CDPAP, and notifying the proper DSS or MMCO of any circumstances which may affect the Consumer's ability to meet those responsibilities. *See id.* § 505.28(j)(v);

F.      Entering into contracts with local Departments of Social Services and MMCOs for FI services. *See id.* § 505.28(j)(vii); and

G.      Entering into a Memorandum of Understanding with each Consumer, identifying the parties' responsibilities under the CDPAP. *See id.* § 505.28(j)(viii).

**Plaintiff All-American Home Care**

17.      My Chief Financial Officer and I established All-American Home Care in 2014. As discussed *infra*, that's an important date to remember.

18.      We are a highly regarded FI. All-American serves 372 Consumers and 513 Personal Assistants.

19.      Our roughly 500 Personal Assistants come from all types of backgrounds: some are family members of Consumers, others are full time home care aides who take care of multiple Consumers. Some have advanced degrees, others lack high school diplomas. All are compassionate and help their Consumers with their most intimate needs.

20.      Our office staff is as professional as our caregivers are compassionate. I have been in the homecare business for 20 years and attended law school. Our CFO has an MBA and our Chief Strategic Officer is a prominent local attorney. Our HR Director, our Controller, and our Director of Operations are the best in the business. Our Consumer Assistance team reflects its leadership.

21.      We also have a Quality Assurance Committee ("QAC"). When one of our Consumer Assistant specialists discovers a problem, it is reported to the QAC for prompt

investigation. The QAC recommends a course of redress – employee termination, suspension, or even reward. In the rare event that fraud is discovered, AAHC immediately notifies the Attorney General.

22.     The work product of the entire AAHC team is unrivaled. We have undergone several routine audits by the Office of Medicaid Inspector General. Those audits have uncovered precisely ZERO cases of fraud.

23.     Not surprisingly, demand for AAHC services has been strong. On the MMCO side of the ledger, AAHC has contracts with 5 of the leading insurance carriers in the business. The MMCOs have expressed appreciation for the ability to work with professional business management.

24.     Our success with counties throughout upstate New York is even more pronounced. AAHC has contracts with more than 20 counties, thereby establishing perhaps one of the largest geographical footprint of any CDPAP agency in the state.

25.     AAHC serves vulnerable people from Jamestown to Watertown, in cities like Buffalo, Rochester, Syracuse, and the Capital Region. AAHC also serves scores of rural towns with unmarked dirt roads.

26.     The population of the geographical area served by AAHC is approximately 3.1 million people. **This population exceeds that of 19 states**.

27.     AAHC's contracts are its sole source of revenue. They alone enable AAHC to pay its employees, its rent, its utility bills, and to meet the myriad of other obligations required to run a business.

28.     Defendants have declared those contracts to be null and void, effective April 1, 2025.

**Defendants' Political Decision and Unlawful RFP**

29.    The New York State Legislature, at the behest of Defendants, enacted amendments to Section 365-f of the New York State Social Services Law. The amendments:

A.    Nullify all of the private contracts FIs have with both MMCOs and counties, and forbid all FIs from providing CDPAP services effective April 1, 2025.

B.    Provide for the selection of a single, statewide FI to replace the roughly 600 FIs located throughout the state;

C.    Authorize the issuance of an RFP with bidding criteria designed to disqualify all but a tiny fraction of New York State FIs from bidding, and enabling Defendants to award the SFI contract to its pre-selected, out of state favorite.

**Bidding Criteria to Be the Single Statewide FI**

30.    The amended statute, Section 365-f, required the establishment of a single "statewide fiscal intermediary." N.Y. Soc. Servs. Law § 365-(f)(4-a)(a)(i).

31.    Amended Section 365-f spawned a lengthy Request for Proposal ("RFP") #20524 which contained "qualifications" seemingly required of all bidders, but, in fact, intended to clear the field for Defendant's favored bidder.  Among the "qualifications":

A.    Bidders must have been providing statewide FI services in another state. , Without statewide performance in another state, CDPAP services provided in New York State would NOT be considered, regardless of how well and for how long those services had been provided, and regardless of the geographical scope of the services provided.

B.    Bidders must "have met and will continue to meet requirements of Section 220(3-a)(a)(iii) of the New York Labor Law that sets forth the certified payrolls and obligations related to such payrolls" (RFP at 21);

C.    Bidders must comply with collective bargaining agreements (*id*. at 7);

D.    Bidders must restrict ownership and controlling interests by prohibiting conflicts with Licensed Home Care Service Agencies (*id.* at 8);

32.    Several of the RFP criteria contradict or are unsupported by the statutory amendment.

33.    Exempting the contract award from approval by the State Comptroller was intended to assure that the award could be made with minimal oversight.

34.    To assure that the selection of the favored bidder, the RFP did not include a scoring system, or provide meaningful information on how offers would be scored. Even when asked, Defendant refused to make public its process for scoring the offers or for weighing the factors set forth in any application (*see* NYSDOH RFP #20524, Questions and Answers, August 7, 2024, Questions 390-447). Defendant retained for itself the sole and unfettered authority to choose whomever Defendant wanted, and to keep the rationale for Defendant's choice entirely secret.

35.    The bidding process was corrupted even before the statutory authorization was passed.

36.    From the get-go, there were press reports that the statute was being amended with the intention of awarding the contract for a single statewide FI to PPL.

37.    PPL operates as an FI in other states on a statewide basis.

38.    PPL had a relationship with SEIU Local 1199, which strongly urged the enactment of the amended statute.

39.    The RFP required that the selected awardee agree that it would be the "joint employer" of CDPAP Personal Assistants. If the single statewide FI was a "joint employer," SEIU 1199 could more easily organize Personal Assistants as SEIU 1199 members.

Case 6:24-cv-06731-EAW    Document 2-2    Filed 12/17/24    Page 9 of 15

**Bidding Criteria to Be Subcontractors**

40.     The RFP requires the pre-selected winner to select subcontractors to perform FI work. But again, the criteria for being a subcontractor eliminate from consideration all but a handful of pre-selected FIs by establishing bidding criteria utterly unrelated to the performance of subcontractor duties. To be eligible, a proposed subcontractor must:

A.     Be an Independent Living Center under Section 1121 of the New York State Education Law on or before January 1, 2024, or

B.     Be an entity that has been providing FI services since 2012.

41.     Despite these unlawful and unconstitutional criteria for bid award, AAHC submitted a timely bid to Defendants.

42.     AAHC is capable of providing FI services on a statewide basis in New York.

43.     Through its successful years of operation in New York as an FI, AAHC has mastered the skills necessary to be an FI and successfully support Consumers in their receipt of CDPAP services.

44.     Nevertheless, Defendants refused to consider AAHC's bid because AAHC does not operate as an FI in any other State besides New York.

**Secret Scoring**

45.     Despite the fact that the qualifying criteria for both bidders and subcontractors are unrelated to an entity's ability to perform the required services, and were instead tailored to suit Defendants' preselected winner, there was always a slight chance that a party other than Defendants' pre-selected winner could emerge victorious under a fair and objective scoring system.

46.     Defendants refused to make public its process for scoring the RFP bids or for weighing the factors set forth in any application (*see* NYSDOH RFP #20524, Questions and

Answers, August 7, 2024, Questions 390-447). Defendants retained for themselves the sole and

unfettered authority to choose whomever they wanted, and to keep the rationale for their choice

entirely secret.

## The Award

47.     To no one's surprise, at approximately 8:00 am on the "Decision Day",

established by Section 365-f, Governor Hochul's office issued a press release announcing the

winner of the rigged RFP process. As had been widely reported in the media weeks and months

before, the award went to Public Partnerships, LLC ("PPL"), a unionized company based in

Georgia.

48.     Despite the fact that "Decision Day" was but minutes old, Governor Hochul's

press release already contained quotes from the representative of the winning party, and a

declaration that PPL would move its headquarters from Georgia to New York State.

49.     The press release also included laudatory quotes from a representative of SEIU

Local 1199.

50.     Upon information and belief, SEIU 1199 has repeatedly expressed its strong to

desire to unionize the statewide network of CDPAP homecare workers.

51.     Upon information and belief, organizing a single FI would be substantially easier

for SEIU 1199 than organizing several hundred separate entities spread across the state.

52.     Upon information and belief, SEIU 1199 has for many decades regularly endorsed

candidates for the New York State Legislature and for Governor, including Governor Hochul.

53.     Upon information and belief, SEIU 1199 has donated significant sums of money

and hours upon hours of campaign labor to its endorsed candidates in New York State, including

Governor Hochul.

54.     SEIU 1199 strongly supported the statutory amendments and the selection of PPI, an entity that SEIU 1199 concluded would be receptive to organizing.

55.     Upon information and belief, Defendant pre-selected PPL on the condition that PPL would make little or no effort to oppose unionization by SEIU 1199 of its New York State operations.

56.     SEIU 1199 was so sure that PPL would be selected that on June 20, 2024, one day before the RFP was issued and three months before the award was announced, SEIU 1199 invited FIs with which SEIU 1199 had relationships to a meeting to discuss PPL as the single statewide FI.

57.     SEIU 1199 was not alone in this belief. Legislative staffers talked openly about PPL as the presumptive awardee as the statutory amendments were negotiated.

58.     In a tweet issued the same day as the Governor's announcement of PPL's award, Manhattan State Senator Brad Hoylman-Sigal stated: "Looking forward to working with @1199SEIU to ensure this plan is successful." *See* Empire Justice Center, B. Hammond, Hochul's CDPAP Overhaul Hands a Costly Win to 1199, October 2, 2024.

### PPL's Questionable Track Record

59.     PPL's track record clearly establishes that it was not chosen for its history of performance. Consider:

A.     Upon information and belief, a 2013 state of PPL's work for Pennsylvania found that there were "significant red flags" indicating that PPL was not prepared to take over there, leading to lapses in caregivers being paid;

B.     Upon information and belief, PPL was sued as part of a class action case in the Eastern District of Pennsylvania involving more than 20,000 home care workers; and

11

C.      PPL has lost or has not had its contracts renewed in the states of New

Jersey, Washington, West Virginia, Virginia, and Tennessee. (By contrast, plaintiff has never had

a contract cancelled or not renewed.)

### New Awards

60.     Not surprisingly, this entire scheme has been the subject of substantial public

outcry and numerous lawsuits in both state and federal courts.

61.     In apparent response, on or about November 12, 2024, Defendants announced that

they are awarding contracts to additional agencies, many of which do not meet the bidding

qualifications established in the amendments to Section 365-f or the subsequent RFP.

### The Change to CDPAP is a Political Payoff

62.     There would appear to be no rational basis for Defendants to go through so many

unlawful lengths to switch to single source with a poor track record, when doing so yields no

positive benefits to CDPAP participants.

63.     Upon information and belief, public employees' union SEIU 1199 has oft

expressed its strong to desire to unionize the statewide network of CDPAP homecare workers.

64.     Upon information and belief, organizing a single FI would be substantially easier

than organizing several hundred separate entities spread across the state.

65.     Upon information and belief, SEIU 1199 has for many decades regularly endorsed

Democratic candidates for the New York State Legislature and for the Governor's Office,

including Governor Hochul.

66.     Upon information and belief, SEIU 1199 has donated exorbitant sums of money

and untold hours of campaign labor to those candidates and to others running for public office in

New York State on the Democratic Party line, including Governor Hochul.

67.     Both houses of the New York State Legislature and the Governor's office are controlled by elected officials enrolled in the Democratic Party.

68.     Upon information and belief, and in response to a public campaign mounted this summer by critics of Defendants' unlawful scheme, SEIU 1199 has briefed and reassured leadership of both legislative houses that Defendants' plan to award the contract to its pre-ordained winner should be supported.

69.     Upon information and belief, Defendants pre-selected PPL on the conditions that PPL would make no effort to oppose unionization of its New York State operations, and that it would move its headquarters to New York State.

70.     Neither of these two pre-conditions were criteria set forth in the RFP.

71.     Upon information and belief, when commenting for a September 23, 2024 newspaper article, a representative for PPL dismissed reports that it already had a deal with New York and curiously told a NY Post reporter that the "New York work has not even been put out to bid yet." (https://nypost.com/2024/09/23/us-news/firm-rumored-for-possible-9-billion-ny-homecare-contract-has-tricky-past-critics/).

72.     In fact, the New York contract was put out to bid on June 17, 2024 (RFP #20524), and the deadline for submitting applications was August 21, 2024.

**Legislative Misgivings**

73.     So unlawful and unsavory has this process been that even some of the New York State Legislators who voted in favor of it have now asked the Governor to reverse course.

74.     Democrats and Republicans in Congress agree that the evidence strongly indicates that the RFP process was rigged for PPL. Members of both parties in New York State's congressional delegation have called upon law enforcement to investigate the RFP process.

75.     For example, Congressman Ritchie Torres (D-NY) asked the Inspectors General for both DOH and the U.S. Department of Health and Human Services to investigate the State's "multibillion dollar boondoggle" which attempted "to put the $9 billion CDPAP in the hands of a single out-of-state vendor with a questionable track record and to do so under false pretenses."

76.     Eight Republican congressional representatives made similar written requests of U.S. House Speaker Mike Johnson and Minority Leader Hakeem Jeffries.

77.     By letter dated October 1, 2024, thirty-one Members of the New York State Assembly—all are Democrats and, upon information and belief, several are attorneys—have expressed serious doubts about the Defendants' scheme as implemented. (The Letter is attached hereto as **Exhibit A**.)

78.     Among the strong objections noted:

    A.     Defendants failed to provide bidders with basic, necessary information;

    B.     Defendants failed to establish meaningful selection criteria;

    C.     Defendants' RFP exceeded and did not reflect its enabling legislation; and

    D.     Defendants' RFP contained arbitrary subcontracting requirements.

79.     The Assembly Members noted that these actions are juxtaposed against additional egregious acts Defendants committed that endanger the CDPAP program. Such actions include but are not limited to budget cuts and dangerously aggressive timelines for implementation of the scheme.

80.     Plaintiff concurs with the views expressed in Exhibit A.

**Defendants' Actions Constitute a Taking**

81.     Defendants actions have both the clearly articulated intention and, if allowed to stand, the actual effect of destroying AAHC. Plaintiff will have no income. It will no longer have State authorization to generate income. It will be out of business.

82.     Accordingly, Defendants' actions constitute a full taking, and Plaintiff is entitled to compensation for the value of its business.

**Conclusion**

83.     For the reasons stated herein and in the accompanying Memorandum of Law, Defendants' actions violate Plaintiff's rights under the Constitution's Equal Protection, Due Process, Commerce, Contracts, Takings, and Bill of Attainder Clauses, and the Court should issue a preliminary injunction.

Dated: December 17, 2024                    *Marco Altieri*
                                            Marco C. Altieri