EXHIBIT A

STATE OF NEW YORK
SUPREME COURT                    COUNTY OF ALBANY

SAVE OUR CONSUMER DIRECTED HOME CARE
PROGRAM, INC.,

                              Plaintiff/Petitioner,

             -against-

NEW YORK STATE DEPARTMENT OF
HEALTH, and JAMES V. N. in his capacity as
Commissioner of Health,

                              Defendants/Respondents,

**DECISION AND ORDER**
Index No. 907872-24

(Supreme Court, Albany County, Article 78 Term)

APPEARANCES:     Paul R. Piccigallo, Esq.
                 Littler Mendelson, P.C.
                 *Attorneys for Plaintiffs/Petitioners*
                 900 Third Avenue
                 New York, New York 10022-3298

                 Jennifer J. Corcoran, Esq., Assistant Attorney General
                 Office of the New York State Attorney General
                 *Attorneys for Defendants/Respondents*
                 The Capitol
                 Albany, New York 12224-0341

HON. JAMES H. FERREIRA, Acting Justice:

        Plaintiff/Petitioner, Save Our Consumer Directed Home Care, Inc. (petitioner), is a not-for-profit association of Fiscal Intermediaries (FIs) currently participating in the Consumer Directed Personal Assistance Program (CDPAP Program), a statewide Medicaid program that provides at-home care alternatives for chronically ill and/or mentally or physically disabled Medicaid beneficiaries. The CDPAP Program allows for the provision of services that help individuals transition from institutional to home and community-based settings. Services,

Case 6:24-cv-06731-EAW    Document 27-1    Filed 02/07/25    Page 3 of 30

including assistance with daily activities, are provided by personal assistants (PAs). Under the

CDPAP Program, the consumer, who is the recipient of personal assistance, has the ability to hire

their own PA to provide personal care, home health, and/or nursing services. The consumer can

hire PAs with whom they are familiar and comfortable, such as their child, sibling, or friend.

According to petitioner, FIs "play an important, necessary, and crucial role in administering wages

and benefits to PAs, processing and documenting their time records and duty sheets, coordinating

Medicaid claims and reimbursement, maintaining copies of service authorizations and

reauthorizations from Managed Care Organizations ('MCOs'), and ensuring compliance with

federal and state requirements governing the Program" (NYSCEF No. 1, ¶ 25). Also according to

petitioner,

> "over 600 FIs operating in New York have been and are currently responsible for
> financial management; maintenance of documents, and administrative oversight,
> including processing all income tax and other required wage withholdings; ensuring
> the health status of each PA is assessed prior to service and annually thereafter,
> conducting Medicaid program participation exclusion list checks with the offices
> of the Medicaid Inspector General and the Inspector General; maintaining
> personnel records for PAs, and acting as the employer of record for PAs for
> workers' compensation and disability insurance purposes. FIs are also mandatory
> reporters to local departments of social service and/or MCOs if there are changes
> in the Consumer's health status or ability to participate in the Program, suspected
> abuse or neglect, unsanitary living conditions, fraud, waste, or abuse related of [sic]
> Medicaid funds, and/or unsafe situations for the Consumer and/or the PA"

(NYSCEF No. 1, ¶26).

Petitioner commenced this hybrid CPLR article 78 proceeding/declaratory judgment action

challenging Chapter 57 of the Laws of 2024 (Part HH, 'the statutory amendments,' or 'the

amended Social Services Law'), enacted as part of New York State's 2024 Budget. As is relevant

to this action, Part HH amended the Social Services Law § 365-f by changing the definition of

"fiscal intermediary" to mean only one "Statewide fiscal intermediary" (SFI). Petitioner challenges

2

the statutory amendments, enacted April 20, 2024, and the actions of respondents in implementing the subsequent Request for Proposals, #20524 (RFP), dated June 17, 2024, seeking an SFI, which RFP was amended on July 19, 2024 (Amendment #1), August 2, 2024 (Amendment #2) and August 7, 2024 (Amendment #3) (see NYSCEF No. 49-50).[1]

Petitioner asserts that the statutory amendments will eliminate more than 600 New York businesses that provide FI services to 246,000 consumers who are enrolled in the CDPAP Program by replacing those FIs with one SFI. Pursuant to the amended Social Services Law § 365-f (4-a)(ii-b), to be eligible to be the SFI, an entity must have been providing FI services in a state other than New York on a statewide basis as of April 1, 2024. Petitioner contends that the RFP sets forth "anti-competitive, unreasonable restrictions and specifications creating an almost insurmountable bar for an entity to merely qualify as the SFI, significantly exceeding and expanding on the requirements set forth in the amended statute" (NYSCEF No. 1, ¶4).[2] For example, Amendment #3 to the RFP, issued on August 7, 2024, provides that "[f]or the purposes of minimum qualification, 'statewide basis in at least one other state' means that the entity is currently engaged in a contract with the single State agency established or designed to administer or supervise the administration of the State's Medicaid program in a state other than New York, to be a provider

---

[1] The RFP was issued on June 17, 2023, and amended July 19, 2024 (Amendment #1), August 2, 2024 (Amendment #2), and August 7, 2024 (Amendment #3).

[2] Petitioner asserts that, "[f]or example, the RFP includes specifications requiring the bidder to have been performing FI services on a statewide basis in another state as of April 1, 2024, to pledge to provide the DOH with a draft agreement for a $100,000,000 line of credit within ten days of being notified of contract approval, to comply with the terms of collective bargaining agreements and to certify current and future compliance with New York's prevailing wage laws set forth in Section 220 of the New York Labor Law, which applies to work performed by 'Workers, Laborers and Mechanics employed on a public project' " (NYSCEF No. 1, ¶5). Petitioner also challenges the RFP's "Initial Transition Activities," contending that the transition plan creates delays that will interrupt services to consumers.

3

Case 6:24-cv-06731-EAW    Document 27-1    Filed 02/07/25    Page 5 of 30

of fiscal intermediary services throughout the entire geographic area of the subject state"
(NYSCEF No. 5). Petitioner argues that the amendments to the Social Services Law are vague,
ambiguous, contrary to law, and impermissibly suspend the competitive bidding requirements and
oversight procedures conducted by the Comptroller pursuant to the State Finance Law §§112 and
163 and the Economic Development Law § 142.  Petitioner also argues that the implementation
of the RFP, which includes additional terms and conditions not contemplated by the Social
Services Law, will "unconstitutionally and illegally deprive Petitioner's members the ability to
provide FI services in violation of state and federal laws, and in some cases, their Consumers'
ability to receive sufficient and adequate Medicaid services through the CDPA[P] Program"
(NYSCEF No. 1, ¶9).

Petitioner alleges twelve causes of action asserting, among other things, that respondents'
actions violate State and Federal procurement laws and regulations, the Americans with
Disabilities Act (ADA), the Commerce, Contracts, and Equal Protection Clauses of the United
States Constitution, and the New York State Constitutional Separation of Powers and Equal
Protection Clauses. Petitioner asserts that, since New York State participates in the Medicaid
program and receives federal funds from the United States Department of Health and Human
Services (HHS), including through the Centers for Medicare and Medicaid Services (CMS) to
implement its home and community-based programs, the amended Social Services Law and the
RFP violate and are preempted by Federal Medicaid Laws and Regulations (Medicaid Act) (see
42 USC 1396a). Petitioner argues that, unless respondents obtain a waiver pursuant to the
Medicaid Act, respondents cannot restrict Medicaid beneficiaries' freedom of choice of providers
(see 42 CFR 430.25; 431.51). Thus, petitioner seeks an order enjoining respondents from

4

implementing the RFP and selecting an SFI, together with an order declaring the that statutory amendments to Social Services Law § 365-f are arbitrary and capricious, unconstitutional, and/or contrary to law.[3]

As the amendments to Section 365-f and the RFP have mandated that certain of the entities providing FI services pursuant to the CDPAP Program in New York cease their operations by April 1, 2025, petitioner has made the instant application by Order to Show Cause, dated August 28, 2024 (McDonough, J), seeking an Order preliminarily enjoining respondents from taking further action to implement the RFP.[4] Respondents oppose petitioner's application. Oral argument was held on October 11, 2024.

## LAW

"[A] preliminary injunction is a provisional remedy, interlocutory in nature, designed to maintain the status quo until adjudication of the merits" (Moore v Ruback's Grove Campers' Assn., Inc., 85 AD3d 1220, 1221 [3d Dept 2011]). "The party seeking a preliminary injunction must demonstrate a probability of success on the merits, danger of irreparable injury in the absence of an injunction and a balance of equities in its favor" (Nobu Next Door, LLC v Fine Arts Hous., Inc., 4 NY3d 839, 840 [2005]; see CPLR 6301, 6312 [a]; Biles v Whisher, 160 AD3d 1159, 1160

---

[3] Petitioner also asserts a cause of action based on respondents' failure to respond to its June 10, 2024 Freedom of Information Law request seeking certain records relating to the statutory amendments. However, that issue is not briefed in this application.

[4] Petitioner's Order to show cause also seeks an order "permanently enjoining Respondents from proceeding with the RFP #20524," and orders granting the declaratory relief sought through the petition (NYSCEF No. 22). However, " '[a]bsent extraordinary circumstances, a preliminary injunction will not issue where to do so would grant the movant the ultimate relief to which he or she would be entitled in a final judgment' " (Matter of St. Michael's Home v Valmas, 230 AD3d 1320, 1322 [2d Dept 2024], quoting Zoller v HSBC Mtge. Corp. [USA], 135 AD3d 932, 933, [2d Dept 2016]).

5

[3d Dept 2018]; Karabatos v Hagopian, 39 AD3d 930, 931 [3d Dept 2007]). "The decision to grant or deny provisional relief, which requires the court to weigh a variety of factors, is a matter ordinarily committed to the sound discretion of the lower courts" (Doe v Axelord, 73 NY2d 748, 749 [1988]; see Nobu Next Door, LLC v Fine Arts Hous., Inc., 4 NY3d at 840]).

**The Medicaid Program**

"Medicaid, a joint federal-state program, provides federal funding for state programs that provide medical assistance, rehabilitation, and other services to individuals with limited income and resources. States choosing to participate in Medicaid must administer the program through a single state agency. New York State's [DOH] is the state agency responsible for the administration of Medicaid in New York" (Duncan v Sullivan County, 18 CV 9269 (VB), 2020 WL 1033064, *1 [SDNY Mar 2, 2020]). The Medicaid program was established pursuant to Title XIX of the Social Security Act (see 42 USC 1396 et seq) and, pursuant to its terms, the federal government contributes funds to states that participate in the program (see 42 USC 1391-1). Those states that opt to participate in the Medicaid Program are required to follow certain reporting and administration mandates including, as is relevant to this proceeding, establishing compliance with Federal regulations regarding procurement procedures when utilizing vendors providing fiscal management services (see 42 USC 1396a; 45 CFR 75.326 ["When procuring property and services under a Federal award, a state must follow the same policies and procedures it uses for procurements from its non-Federal funds"]; 45 CFR 75.327 [a] ["The non–Federal entity must use its own documented procurement procedures which reflect applicable State, local, and tribal laws and regulations, provided that the procurements conform to applicable Federal law and the

6

Case 6:24-cv-06731-EAW    Document 27-1    Filed 02/07/25    Page 8 of 30

standards identified in this part"]; see also 42 CFR 441.484 [a][2]).[5] Federal procurement

procedures provide for different methods of procurement including, among others, procurement

by sealed bids, procurement by competitive proposals and, in the event of a public emergency or

if a service is available only from a single source, procurement by noncompetitive proposals (see

45 CFR 75.329). When a procurement is sought through competitive proposals,

(1) "Requests for proposals must be publicized and identify all evaluation factors and their relative importance. Any response to publicized requests for proposals must be considered to the maximum extent practical;

(2) Proposals must be solicited from an adequate number of qualified sources;

(3) The non-Federal entity must have a written method for conducting technical evaluations of the proposals received and for selecting recipients;

(4) Contracts must be awarded to the responsible firm whose proposal is most advantageous to the program, with price and other factors considered; and

(5) The non–Federal entity may use competitive proposal procedures for qualifications-based procurement of architectural/engineering (A/E) professional services whereby competitors' qualifications are evaluated and the most qualified competitor is selected, subject to negotiation of fair and reasonable compensation. The method, where price is not used as a selection factor, can only be used in procurement of A/E professional services. It cannot be used to purchase other types of services though A/E firms are a potential source to perform the proposed effort."

(45 CFR 75.329 [d][1-5]).

States opting to participate in the Medicaid program are also required to ensure that "any

individual eligible for medical assistance (including drugs) may obtain such assistance from any

institution, agency, community pharmacy, or person, qualified to perform the service or services

required (including an organization which provides such services, or arranges for their availability,

---

[5] New York State's procurement provisions for services are found in State Finance Law § 163, which provides, among other things, for an independent review by the State Comptroller to determine compliance with the procurement law (State Finance Law § 163 [12]).

7

on a prepayment basis), who undertakes to provide him such services" (Freedom of Choice Provision) (42 USC 1396a[a][23]).

If a State wishes to deviate from the statutorily required mandates of the Medicaid program, the Secretary of Health and Human Services (HHS) may grant that State a waiver (see 42 USC 1396n [b]; 42 USC 431.51; 42 USC 431.55; 42 USC 430.25; see also Social Services Law §365-f [5]).

### Social Services Law § 365-f

New York participates in the Medicaid program through its CDPAP Program, which "is intended to permit chronically ill and/or physically disabled individuals receiving home care services under the medical assistance program greater flexibility and freedom of choice in obtaining such services" (Social Services Law § 356-f [1]). Prior to 2024, FIs were able to contract with consumers to provide fiscal intermediary support services in order to facilitate the financial aspects of the relationship between CDPAP participants and their chosen caregivers, and to ensure compliance with the Medicaid program. The 2024 amendments to the Social Services Law § 365-f changed, among other things, the definition of "fiscal intermediary" to include one "Statewide fiscal intermediary," which

> "shall subcontract to facilitate the delivery of fiscal intermediary services to an entity that is a service center for independent living under section one thousand one hundred twenty-one of the education law[6] that has been providing fiscal intermediary services since January first, two thousand twenty-four or earlier. The statewide fiscal intermediary shall further subcontract to facilitate the delivery of fiscal intermediary services with at least one entity per rate setting region that has a proven record of delivering services to individuals with disabilities and the senior population, and has

---

[6] "A service center for independent living shall be a community based non-residential program designed to promote independent living for persons with disabilities" (Education Law § 1121 [1]).

been providing fiscal intermediary services since January first, two thousand twelve;[7] provided that such subcontractor shall be required to provide any delegated fiscal intermediary services with cultural and linguistic competency specific to the population of consumers and those of the available workforce, and shall comply with the requirements for registration as a fiscal intermediary set forth in subdivision four-a-one of this section. For purposes of this section, 'delegated fiscal intermediary services' are defined as fiscal intermediary services as set forth in subparagraph (ii) of paragraph (a) of this subdivision that the statewide fiscal intermediary includes in a subcontract and which shall include services designed to meet the needs of consumers of the program, which may include assisting consumers with navigation of the program by providing individual consumer assistance and support as needed, consumer peer support, and education and training to consumers on their duties under the program"

(Social Services Law §365-f [4-a][a][i]; [ii-b]).

Pursuant to Social Services Law § 365-f,

"[n]otwithstanding section one hundred sixty-three of the state finance law, section one hundred twelve of the state finance law, or section one hundred forty-two of the economic development law[8] the commissioner shall enter into a contract under this subdivision with an eligible contractor that submits an offer for a contract, provided, however, that:

(i)  the department shall post on its website:

(A) a description of the proposed statewide fiscal intermediary services to be provided pursuant to a contract in accordance with this subdivision;

(B) the criteria for selection of the statewide fiscal intermediary, which shall include at a minimum that the eligible contractor is capable of performing statewide fiscal intermediary services with demonstrated cultural and language competencies specific to the population of consumers and those of the available workforce, has experience serving individuals with disabilities, and as of April first, two thousand twenty-four is providing services as a fiscal intermediary on a statewide basis with at least one other state;

---

[7] The RFP, attachment D, identifies four rate setting regions as the "NYC Area," "Mid-Hudson/Northern Metro," "Northeast/Western," and "Rest of State" (NYSCEF No. 4, pages 6 and 33).

[8] State Finance Law §§ 112 and 163 set forth the statutory bidding, procurement, oversight, and contract approval practices for State agencies. Economic Development Law § 142 provides for the daily publication of a procurement opportunities newsletter by the Commissioner of the Department of Economic Development.

9

(C) the manner by which prospective contractors may seek such selection, which may include submission by electronic means;

(ii) all offers that are received from prospective contractors in a timely fashion and that meet the criteria set forth in clause (B) of subparagraph (i) of this paragraph shall be reviewed by the commissioner; and

(iii) the commissioner shall award such contract to the contractor that meets the criteria for selection and offers the best value for providing the services required pursuant to this section and the needs of consumers"

(Social Services Law §365-f [4-a][b][i-iii]).

**The RFP, #20524, dated June 17, 2024 as amended July 19, 2024 (Amendment #1), August 2, 2024 (Amendment #2) and August 7, 2024 (Amendment #3)**

As is relevant to petitioner's application, the subsequent RFP seeking proposals, in addition

to the criteria set forth in the Social Services Law, requires that

1) the SFI furnish a $100,000,000.00 revolving line of credit to be used exclusively by the SFI to meet its obligations under the contract (see NYSCEF No. 4);

2) the SFI attest that "every bidder and evert subcontractor will have met and will continue to meet the requirements of Section 220 (3-a)(a)(iii) of the Labor Law that sets forth the certified payrolls and obligations related to such payrolls" (NYSCEF No. 4, page 22);

3) the SFI certify that all its physical locations satisfy the 2010 ADA Standards for Accessible Design (see id., at page 9);

4) the SFI comply with collective bargaining agreements (see id., at page 8);

5) the SFI ensure the avoidance of conflicts of interest, which may include an entity that is owned or controlled by a Licensed Home Care Service Agencies (LHCSA) or a Managed Care Organization (MCO) that owns or holds a controlling interest in an LHCSA;

6) the contractual term for the SFI be set at five years (see id., at page 5); and

7) subcontractors are prohibited from setting wage rates or benefits for PAs (see id., at page 16).

Pursuant to the amended Social Services Law, to be eligible to be the SFI, an entity must be providing FI services in a state other than New York on a statewide basis as of April 1, 2024. The RFP, Amendment #3 clarified that "[f]or the purposes of minimum qualification, 'statewide basis in at least one other state' means that the entity is currently engaged in a contract with the single State agency established or designed to administer or supervise the administration of the State's Medicaid program in a state other than New York, to be a provider of fiscal intermediary services throughout the entire geographic area of the subject state" (NYSCEF No. 5, page 3).

## PETITIONER'S ORDER TO SHOW CAUSE

In support of its application seeking a preliminary injunction, petitioner presents, among other things, the petition, and the affirmations of David Inzlicht (Mr. Inzlicht), the Chief Executive Officer of Attending Home Care Services, LLC (AHCS), and Carmen Colon (Ms. Colon), a Medicaid recipient and consumer that participates in the CDPAP Program.

### Affidavit of David Inzlicht

Mr. Inzlicht attests that AHCS operates as an FI in the CDPAP Program, providing support for chronically ill and disabled individuals. Once an individual, also known as a consumer, has been authorized to participate in the CDPAP Program, the consumer is responsible for 1) hiring a PA to provide home care services, and 2) choosing an FI to provide administrative support (see NYSCEF No. 13, ¶¶5-7). AHCS, which has been a FI since 2016 and operates only in New York State, provides FI services to approximately 720 consumers in Kings, Manhattan, Richmond, Queens, Nassau, Suffolk, Rockland, Westchester, Orange, and Albany counties, and serves a diverse population from differing nationalities. AHCS staff members speak a number of languages,

11

Case 6:24-cv-06731-EAW    Document 27-1    Filed 02/07/25    Page 13 of 30

including English, Spanish, Russian, Ukrainian, Creole, Yiddish, Hebrew, Cantonese, and Mandarin.

Mr. Inzlicht attests that the amendments to Social Services Law § 365-f (4-a) and the provisions of RFP will prohibit AHCS from operating as a FI in New York, since the amendments require the new single SFI to also provide FI services in one other state – a qualification AHCS cannot meet. Accordingly, AHCS is anticipated to lose $33,000,000.00 in gross revenue and $1,500,000.00 in annual profits. Mr. Inzlicht also attests that, because of the amendments and the RFP, AHCS's 20 administrative staff will lose their jobs, and its investments in its operations will be lost.

## Affidavit of Carmen Colon

Ms. Colon is a Medicaid recipient and consumer that participates in the CDPAP Program. Ms. Colon attests that she requires personal assistance due to her medical issues, and that she receives that assistance from her daughter-in-law and another close friend, who are both employed as her PAs. Ms. Colon's FI for these services is Armor Home Care, which operates solely in New York. Both of Ms. Colon's PAs speak her native language – Spanish. Colon also attests that she has had "pleasant and comforting interactions" with Armor Home Care's FI team (NYSCEF No. 11, ¶ 11). With respect to the amendments to the Social Services Law, Ms. Colon attests that she has been advised that her current PAs will not qualify as Home Health Aides under New York certification requirements. Ms. Colon attests that she has not been provided any plans to transition her care, and that the interruption in care that she receives from her PAs will put her at risk of losing her independence.

12

## Petitioner's Arguments in Support of an Injunction

Petitioner argues that respondents' actions, including the implementation of the statutory amendments and the issuance of the RFP, are arbitrary, capricious, and irrational, and conflict with lawful standards and procedures. Specifically, petitioner argues that, with respect to its application seeking a preliminary injunction, it is likely to succeed on the merits because

1) the statutory amendments and the specifications set forth in the RFP are irrational, arbitrary, and capricious because they conflict with the purpose of the CDPAP Program and are in violation of Federal and New York State procurement laws;

2) the RFP's requirement that entities rid themselves of any purported conflict of interest, such as having a common or controlling ownership in a LHCSA, is without basis, is not mandated by Section 365-f, and forecloses experienced homecare providers in New York from qualifying as the SFI;

3) the requirement in the RFP that bidders certify compliance with New York's prevailing wage laws is irrational as it does not apply to this industry, but rather to "Workers, Laborers and Mechanics employed on a public project" (Labor Law § 220);

4) that the mandate for out-of-state experience, while neglecting in-state experience is without a rational basis, since other states have differing regulations and laws, and respondents have no way to ensure that the SFI can provide adequate access to services and satisfy the cultural and linguistic needs of New York consumers;

5) the provisions in the RFP permitting the SFI to contract with only one subcontractor in each rate setting region fails to ensure that consumers will have adequate access to services;

6) the RFP's requirement that bidders comply with any applicable collective bargaining agreement is without a rational basis;

7) respondents failed to comply with Social Services Law § 365-f (4-c) by failing to "convene and chair a stakeholder workgroup pertaining to fiscal intermediary services and the needs of consumers. . . .[to] identify and develop best practices pertaining to the delivery of fiscal intermediary services; inform the criteria for use by the department for the selection of entities under subdivision four-a of this section; identify whether services differ for certain consumers and under

13

what circumstances; inform criteria in relation to the development of quality reporting requirements; and work with the department to develop transition plans for consumers that may need to transition to another fiscal intermediary;"

8) the amendments and the RFP, insofar as they eliminate competitive bidding and violate the State Finance Law, are arbitrary, capricious, contrary to law, do not protect the public fisc, and do not serve the public interest;[9]

9) the bonding requirement, in the amount of $100,000,000.00, is excessive and acts as an insurmountable barrier to most FIs;

10) the requirement that the SFI be an entity that has been providing FI services outside of New York on a statewide basis as of April 1, 2024 is unjustified;

11) respondents' mandate - that the entities with whom the SFI will subcontract be established FIs prior to January 1, 2012 and whom have been continuously providing CDPAP services - is without a rational basis;

12) the absence of Comptroller oversight and review is in violation of the New York State Finance Law § 163;[10]

13) respondents impermissibly legislate through the RFP in violation of the New York State Constitution Separation of Powers Doctrine;

14) the RFP fails to provide for full and open competition and imposes unreasonable requirements in violation of 45 CFR 75.327(l) and 75.328;

15) by excluding from consideration those FIs that operate solely in New York and/or operating in any other state in less than a statewide capacity, as well as those FIs that have a common and/or controlling interest in a LHCSA, respondents have violated the State and Federal Constitutions' Equal Protection Clauses;

---

[9] Petitioner notes that "[t]he State's procurement laws and regulations obligate agencies to, *inter alia*: conduct formal competitive procurements to the maximum extent possible; promote and afford first priority to businesses certified as Minority [] and Women-Owned Business Enterprises ("MWBEs") and/or Service-Disabled Veteran-Owned Business Enterprises ("SDVOBs"); clearly specify the requirements or work to be performed when soliciting bids; offer fair and equal opportunities for bidders to submit responsive offers; implement a balanced and fair method of award; and minimize the use of single source procurements such that they are implored 'only when a formal competitive process is not feasible'" (NYSCEF No. 20, pages 31-32, citing Sate Finance Law § 163, Executive Law § 313, and Veterans' Services Law § 42).

[10] Petitioner cites to the New York State Comptroller's Enacted State Budget for Fiscal Year 2024-25, wherein the Comptroller found the contract for the SFI for the CDPAP Program to be problematic since it "bypasses the Office of the State Comptroller pre-audit review and competitive bidding" process (NYSCEF No. 10, page 23).

14

16) the statutory amendment and the RFP disfavor hundreds of FIs that have been operating solely in New York prior to April 1, 2024 in violation of Commerce Clause of the United States Constitution;

17) the statutory amendment, which provides that as of April 1, 2025, "[e]xcept for the statewide fiscal intermediary and its subcontractors . . . no entity shall provide, directly or through contract, fiscal intermediary services" (Social Services Law § 365-f [4-a-1][a]) will alter and impair thousands of contracts in violation of the Contracts Clause of the United States Constitution;

18) respondents have engaged in an impermissible bill of attainder by preventing a group of FIs from qualifying to be the SFI;

19) respondents actions are pre-empted by the Freedom of Choice provisions in the Medicaid Law (see 42 USC 1396a[a][23]); and

20) respondents actions have placed consumers at risk of institutionalization in violation of the Affordable Care Act and the ADA (see Olmstead v L.C., 527 US 581 [1999]).

Petitioner argues that, based on the forgoing, which includes the impending shutdown of over 600 in-state businesses, the loss of numerous jobs and investments, together with the loss of services and/or the interruption in services to Consumers enrolled in the CDPAP Program, it has established a probability of success on the merits, irreparable harm, and that injunctive relief is in the public interest.

## RESPONDENTS' OPPOSITION TO AN INJUNCTION

In opposition to petitioner's application, respondents argue that petitioner has failed to establish the requisite likelihood of success on the merits, irreparable injury, or that the balance of the equities weighs in petitioner's favor.

**Affirmation of Amir Bassiri**

In opposition to petitioner's application, respondents present the Affirmation of Amir Bassiri, the Deputy Commissioner of the Office of Health Insurance Programs at the DOH.   Mr.

15

Bassiri provides the history of the Federal Medicaid and the CDPAP Program and affirms that "[i]t is the responsibility of the fiscal intermediary ('FI') to perform the necessary administrative functions to 'facilitate the consumer's role as the employer,' such as processing wages and benefits, processing all income tax and other required wage withholdings, and maintaining employment records on behalf of the consumer" (NYSCEF No. 28, ¶ 10, citing Social Services Law § 365-f [4-a][a][i-ii]; see 18 NYCRR 505.28[j]). Based on the most recent information available to DOH, approximately 600 FIs operate in the state, and the CDPAP Program is estimated to serve approximately 280,000 consumers and employs over 300,000 full-time-equivalent PAs. Mr. Bassiri affirms that New York State's current FI model "is an extreme outlier when compared to the rest of the nation," resulting in excessively high administrative rates being paid to New York FIs - more than double the average rate paid by other states.

Mr. Bassiri affirms that, under the pre-amendment model, FIs contracted directly with managed care plans and local social services districts to act as administrative agents. Under the pre-amendment model, FIs remained unregulated, and were not required to be licensed or to register with the State or DOH, resulting in the inability for the DOH to effectively oversee FIs or control the number of FIs in the market. In response, the State Legislature attempted to bring the FI market "into some format that is amenable to regulation" (NYSCEF No. 28, ¶15). Mr. Bassiri affirms that the "most recent amendment to the Social Services Law builds on existing CDPAP models in other states wherein the state's Medicaid program contracts with a single statewide FI to perform the requisite administrative function for the entire consumer directed program to reduce administrative cost growth, strengthen oversight and program integrity, and ensure home care services are not disrupted during the transition to a statewide FI" (NYSCEF No. 28, ¶16). Mr.

16

Bassiri affirms that the language set forth in the amended statute and the RFP ensures that the change to a SFI will not interrupt FI services.

According to Mr. Bassiri, the basis for the amendments to the Social Services Law, was to ensure that money was being spent on services delivered to consumers of the CDPAP Program, rather than being spent on unnecessary FI administrative costs. For example, "funding for FI services exceeds the entirety of Medicaid payments to nursing facilities, which are subject to rigorous licensure, regulation, and other standards to promote consumer protections and quality of care" (NYSCEF No. 28, ¶21). Mr. Bassiri states that a single statewide FI with subcontractors is estimated to reduce administrative costs from approximately 8% to 3% of the current CDPAP spending without impacting funding or wage reimbursement to aides delivering actual personal care services. The amendments will also reduce waste and streamline access to care, and provide the DOH with better oversight of the SFI, subcontractors, and CDPAP Program, generally.[11] The amendments to the Social Services Law are expected to save the CDPAP Program an anticipated $200 million dollars this year (see NYSCEF No. 30, page 3).

With respect to the RFP, Mr. Bassiri affirms that "[r]ather than subjecting the procurement process to Comptroller review, the [L]egislature exempted the process from State Finance Law §§ 112 and 163, and Economic Development Law § 142, and has instructed DOH to provide the selection criteria that will be used to evaluate potential bidders" (NYSCEF No. 28, ¶36). Mr. Bassiri points to the NYS Procurement Guidelines from September 2023, which were established by the State Procurement Council pursuant to State Finance Law § 161 (see NYSCEF No. 31).

---

[11] This oversight, according to Mr. Bassiri, will result in the DOH being able to track Medicaid payments more effectively and analyze data for patterns that may be indicative of fraud, waste, and abuse. This change will also allow the Office of the Medicaid Inspector General to conduct auditing of the SFI more quickly and comprehensively.

17

Mr. Bassiri also affirms that the DOH engaged in "countless conversations with CMS, stakeholders, and other state Medicaid programs to discuss the challenges and mistakes other states have faced when enacting similar changes to their FI program. Based on its wealth of knowledge, DOH issued 35 pages of bidding requirements in RFP #20524" (NYSCEF No. 28, ¶¶ 36-37).

Mr. Bassiri addresses petitioner's challenges with the statutory amendments and the RFP as follows:

1) With respect to bidder qualifications, the RFP does not exclude New York FIs from applying. Rather, FIs in New York are eligible to submit a proposal if that have a contract with another state's Medicaid program to provide FI services in that state. This requirement is to ensure that the bidding entity has experience with the statewide model.

2) The revolving credit requirement serves as an additional safeguard for New Yorkers. When Pennsylvania attempted to implement the SFI model, during its transition, there were issues ensuring that caregivers were timely paid. The revolving credit requirement eliminates this issue and ensures that the SFI has the necessary liquidity to cover costs.

3) Because many of the current FIs would not qualify to be the SFI, Social Services Law § 365-f and the RFP provide that the SFI can subcontract with "at least one entity per rate setting region that has a proven record of delivering services to individuals with disabilities and the senior population, and has been providing fiscal intermediary services since January first, two thousand twelve" (NYSCEF No. 28, ¶45). The January 2012 cutoff date was the same date requirement that the former Social Services Law § 365-f required for FI eligibility.

4) Pursuant to the statutory amendments, the SFI will contract with "at least one other subcontractor per rate setting region" to facilitate the CDPAP Program (NYSCEF No. 47). "With regional foci, subcontractors will have the necessary cultural and linguistic capacity for consumers in their respective regions" (NYSCEF No. 28, ¶49).

5) LHCSAs do not perform the same functions as FIs. LHCSAs can provide homecare services, while FIs provide administrative services. An entity that is owned or controlled by a LHCSA and also serves as an FI, would be providing both care services and administrative services, including verifying payments, which could create a conflict of interest.

18

6) Independent Living Centers (ILCs) provide services such as assistance with housing, advocacy, counseling, and FI services. By the statutory amendments, the legislature sought to preserve the role of ILCs in the CDPAP Program.

## Likelihood of Success on the Merits

Respondents argue that the statutory amendments and the terms of the RFP were developed over a number of years by both the Legislature and DOH to address issues related to the cost of the CDPAP Program, the efficiency of the program, and the services provided to its consumers. The RFP articulates bidder qualification standards and solicits competitive proposals. With respect to potential conflicts of interest as it relates to LHCSAs, respondents argue that the DOH has an obligation to protect taxpayer interests. Respondents argue that requirement that the bidders provide FI services in another state is rationally designed to ensure that the single SFI has the experience in providing such services on a statewide basis. Respondents note that New York FIs are not prohibited from applying to be the SFI, and current FIs may be eligible to subcontract with the winning bidder. Finally, respondents argue that neither the amended Social Services Law § 365-f nor the RFP will prevent a consumer currently receiving CDPAP services or their PA from continuing those services, and the implementation of the RFP has not placed consumers at risk of institutionalization.

## Irreparable Harm and the Balancing of the Equities

Respondents argue that petitioner cannot establish that it will suffer irreparable harm absent the grant of injunctive relief since the alleged irreparable harm is based on the false premise that all FIs will have to shut down when, in fact, the amendments to Social Services Law § 365-f permit the current FIs to apply to serve as subcontractors to the SFI. Respondents also argue the grant of a preliminary injunction will result in a devastating financial impact for the current fiscal year

19

ending on March 31, 2025, and the State will be required to find the $200 million in savings to fund the CDPAP Program. This savings could be through rate cuts, which would reduce payments to healthcare providers, and allow continued inefficiency and waste in Medicaid spending.

## LEGAL ANALYSIS

### A. Likelihood of Success

#### Procurement

The Social Services Law § 365-f sets forth the methods by which the Commissioner shall enter into a contract with an eligible contractor, notwithstanding the procurement provisions set forth in State Finance Law §§ 112 and 163, and Economic Development Law § 142. The statutory amendments provide that the DOH post on its website selection criteria "which shall include *at a minimum* that the eligible contractor is capable of performing statewide fiscal intermediary services with demonstrated cultural and language competencies specific to the population of consumers and those of the available workforce, has experience serving individuals with disabilities, and as of April first, two thousand twenty-four is providing services as a fiscal intermediary on a statewide basis with at least one other state" (Social Services Law § 365-f [4-b][i][A-C][emphasis added]). Respondents were not limited or restricted in the criteria for selection and, accordingly, for purposes of petitioner's application, the Court finds that petitioner has failed to establish the likelihood of success on the merits with respect to is allegations that respondents violated New York State procurement laws. Likewise, for purposes of petitioner's application, at this stage of the proceedings, the procurement process utilized by respondents complies with federal procurement laws (see 45 CFR 75.329 [d][1-5]). Accordingly, for purposes of petitioner's application, the Court finds that petitioner has failed to establish a likelihood of

20

success on the merits with respect to its argument that respondents have violated State and Federal procurement laws and regulations.

## RFP Requirements

At this stage of the proceedings, the Court finds that petitioner's challenges to the criteria set forth in the statutory amendments and the RFP for the selection of the SFI are not arbitrary, capricious, and without a rational basis. Specifically, respondents have identified a rational basis for 1) the statutory amendments and the need to regulate the unregulated FI industry; 2) the requirement that bidder entities rid themselves of any potential conflict of interest; 3) the mandate for the SFI to have out-of-state experience; 4) the requirement that the SFI to subcontract with at least one entity in the State's four rate-setting regions to provide services with cultural and linguistic competency specific to the population of consumers and those of the available workforce; 5) the SFI bonding requirement; and 6) the requirement that subcontractors be established FIs.[12] Respondents also have presented evidence that they convened with stakeholder groups pertaining to fiscal intermediary services and the needs of consumers. Accordingly, the Court finds that petitioner has failed to establish a likelihood of success on the merits with respect to its argument that the statutory amendments and criteria set forth in the RFP are arbitrary, capricious, and without a rational basis.

---

[12] To the extent that petitioner challenges the RFP's requirement that bidders comply with Labor Law § 220 and any applicable collective bargaining agreement, the Court finds that respondents' application of the protections set forth in the Labor Law and any wage and labor agreements to the bidder fails to establish a likelihood of success on the merits (see NYSCEF No. 8; see e.g. Labor Law § 220 [1]["Eight hours shall constitute a legal day's work for all classes of employees in this state except those engaged in farm and domestic service unless otherwise provided by law"]). Likewise, the Court is not persuaded that the RFP's requirement - that the SFI's physical location comply with the 2010 ADA and meet municipal building codes - is without a rational basis.

21

Case 6:24-cv-06731-EAW     Document 27-1     Filed 02/07/25     Page 23 of 30

## New York State Constitutional Separation of Powers Doctrine

" 'The constitutional principle of separation of powers requires that the [L]egislature make the critical policy decisions, while the executive branch's responsibility is to implement those policies. The branches of government cannot always be neatly divided, however, and common sense must be applied when reviewing a separation of powers challenge. As long as the [L]egislature makes the basic policy choices, the legislation need not be detailed or precise as to the agency's role' " (Matter of Dry Harbor Nursing Home v Zucker, 175 AD3d 770, 772-773 [3d Dept 2019], lv dismissed in part and denied in part 35 NY3d 984 [2020], quoting Greater N.Y. Taxi Assn. v New York City Taxi & Limousine Commn., 25 NY3d 600, 608-609 [2015]).   If, for example, "an agency was not delegated the authority to enact certain rules, then it would usurp the authority of the legislative branch by enacting those rules" (Greater N.Y. Taxi Assn. v New York City Taxi & Limousine Commn., 25 NY3d at 608). However, " '[a]n agency can adopt regulations that go beyond the text of [its enabling] legislation, provided they are not inconsistent with the statutory language or its underlying purposes' " (id., quoting Matter of General Elec. Capital Corp. v New York State Div. of Tax Appeals, Tax Appeals Trib., 2 NY3d 249, 254 [2004]).

Here, the Legislature provided the DOH with authority to issue an RFP that describes the services to be provided by a SFI and outlined the "minimum" criteria (Social Services Law § 365-f [4-b][i][A-C]). Insofar as the RFP has not been demonstrated to be inconsistent with the Social Services Law, the Court finds that petitioner has failed to establish a likelihood of success on the merits with respect to its argument that the RFP violates the New York State Constitutional Doctrine of the Separation of Powers.

22

**Equal Protection under the United States and New York Constitution**

"Pursuant to the Fourteenth Amendment of the United States Constitution, '[n]o State shall ... deny to any person within its jurisdiction the equal protection of the laws' (U.S. Const. Amend. XIV, § 1). The New York Constitution provides for equivalent equal protection safeguards (N.Y. Const. art. I, § 11" (People v Aviles, 28 NY3d 497, 502 [2016]). " 'A violation of equal protection is deemed to occur when a state agency treats persons similarly situated differently under the law'"(Matter of United Jewish Community of Blooming Grove, Inc. v Washingtonville Cent. Sch. Dist., 207 AD3d 9, 15 [3d Dept 2022], lv granted 39 NY3d 905 [2022], affd 42 NY3d 348 [2024], quoting Matter of Montgomery v New York State Dept. of Corr. & Community Servs., 192 AD3d 1437, 1441 [3d Dept 2021], lv denied 37 NY3d 908 [2021]). "Alleged equal protection violations are primarily evaluated using either a strict scrutiny or a rational basis standard of review. Where governmental action disadvantages a suspect class or burdens a fundamental right, the conduct must be subjected to strict scrutiny, and will be upheld only if the government can establish a compelling justification for the action []. . . . Where a suspect class or fundamental right is not implicated, the government action need only be rationally related to a legitimate governmental purpose" (People v Aviles, 28 NY3d at 502 [internal quotation marks and citations omitted]).

Petitioner's claim of an equal protection violation is premised on the exclusion from eligibility for bidding FIs that operate solely in New York and/or FIs that operate in any other state in less than a statewide capacity. Since the statutory amendments and the RFP do not disadvantage or implicate a suspect class or a fundamental right, the rational basis analysis applies. And, as set forth above, at this stage of the proceedings, the Court finds that petitioner has failed to establish that the grounds for the mandate for the SFI to have out-of-state experience is without a rational

23

basis. Accordingly, the Court finds that petitioner has failed to establish a likelihood of success on the merits with respect to its argument that the statutory amendments violate either petitioner's right to equal protection under the United States Constitution and the New York State Constitution.

**Commerce Clause and Contracts Clause of the United States Constitution and Bill of Attainder**

Petitioner argues that 1) respondents' actions violate the Commerce Clause of the United States Constitution since the statutory amendment and the RFP disfavor hundreds of FIs that have been operating solely in New York prior to April 1, 2024; 2) respondents' actions will alter and impair thousands of contracts in violation of the Contracts Clause of the United States Constitution; and 3) respondents engaged in an impermissible bill of attainder preventing a group of FIs from qualifying to be the SFI.

1.  The Commerce Clause.

The United States Constitution gives the Federal government the power to regulate interstate commerce (see US Const art 1, § 8, cl 3). However, "although the [Commerce] Clause is phrased as an affirmative grant of congressional power, it is well established that it contains a negative or 'dormant' aspect that 'denies the States the power unjustifiably to discriminate against or burden the interstate flow of articles of commerce' " (Brown & Williamson Tobacco Corp. v Pataki, 320 F3d 200, 208 [2d Cir 2003], quoting Oregon Waste Sys., Inc. v Dept of Envtl Quality, 511 US 93, 98 [1994]). "A state statute or regulation may violate the dormant Commerce Clause only if it (1) clearly discriminates against interstate commerce in favor of intrastate commerce, (2) imposes a burden on interstate commerce incommensurate with the local benefits secured, or (3) has the practical effect of extraterritorial control of commerce occurring entirely outside the boundaries of the state in question" (Selevan v New York Thruway Auth., 584 F3d 82, 90 [2d Cir

24

2009][internal quotation marks and citations omitted]). At this stage of the proceedings, petitioner has failed to establish that the statutory amendments discriminate against or impose a burden on interstate commerce incommensurate with the local benefits secured, or that the amendments have the practical effect of controlling commerce outside the State of New York. There is no prohibition against an FI that operates in New York from applying to be the SFI, and respondents have articulated a rational basis for requiring that the bidding entity have out-of-state experience.

     2.  <u>The Contracts Clause</u>

    " 'The Contract[ ] Clause prohibits states from enacting [l]aw[s] impairing the Obligation of Contracts' " (<u>Deutsche Bank Natl Tr. Co. v Dagrin</u>, __ AD3d__, __, 2024 NY Slip Op 06623,* 4 [2d Dept 2024], quoting <u>Matter of Raynor v Landmark Chrysler</u>, 18 NY3d 48, 58 [2011]; <u>see</u> US Const, art I, § 10[1]). "Although facially absolute, the Contracts Clause's prohibition 'is not the Draconian provision that its words might seem to imply' " (<u>Buffalo Teachers Federation v Tobe</u>, 464 F3d 362, 367 [2d Cir 2006], quoting <u>Allied Structural Steel Co. v Spannaus</u>, 438 US 234, 240 [1978]). "It does not trump the police power of a state to protect the general welfare of its citizens, a power which is 'paramount to any rights under contracts between individuals'" (<u>id.</u>, quoting <u>Allied Structural Steel Co. v Spannaus</u>, 438 US at 241). Accordingly, when courts evaluate claims under the Contracts Clause, they ask: "(1) is the contractual impairment substantial[13] and, if so, (2) does the law serve a legitimate public purpose such as remedying a

---

[13] The inquiry as to whether the state law has operated as a substantial impairment of a contractual relationship has three components: "whether there is a contractual relationship, whether a change in law impairs that contractual relationship, and whether the impairment is substantial" (<u>Deutsche Bank Natl Tr. Co. v Dagrin</u>, __ AD3d at __, 2024 NY Slip Op 06623 at 4 [internal citations and quotation marks omitted]).

25

general social or economic problem and, if such purpose is demonstrated, [and] (3) are the means chosen to accomplish this purpose reasonable and necessary" (id., at 368).

Initially, while the statutory amendments could, conceivably, impair certain FI contracts, from the record before it, the Court cannot assess what the terms and conditions of such contracts are and with whom those contracts are entered into. Furthermore, respondents have articulated, for purposes of petitioner's application, a legitimate public purpose in enacting the statutory amendments – to regulate the FI industry, minimize cost, and to save money that can be used to provide services to Medicaid consumers. As such, at this stage of the proceedings, the statutory amendments and RFP are seemingly reasonable and necessary, and petitioner has failed to establish a likelihood of success on its claim of a violation of the Contracts Clause of the United States Constitution.

3. Bill of Attainder

"[T]he Bill of Attainder Clause prohibits any 'law that legislatively determines guilt and inflicts punishment upon an identifiable individual without provision of the protections of a judicial trial.' [] That is, the Supreme Court has identified three elements of an unconstitutional bill of attainder: (1) 'specification of the affected persons,' (2) 'punishment,' and (3) 'lack of a judicial trial'" (ACORN v United States, 618 F3d 125, 135-136 [2d Cir 2010], quoting Selective Service System v Minnesota Public Interest Research Group, 468 US 841, 846-847 [1984]). Here, no entity was specified in the legislation, and petitioner does not identify any specific legislative intent to punish any entities that provide FI services. Rather, the purpose of the statutory amendments was to regulate the FI industry, reduce administrative costs, and use the savings to

26

benefit consumers. Accordingly, at this stage of the proceedings, petitioner has failed to establish a likelihood of success on its claim of an impermissible bill of attainder.

**Freedom of Choice Provision**

The Freedom of Choice provision in the Medicaid Law (see 42 USC 1396a[a][23]) "allows consumers to obtain medical assistance from any qualified entity that 'provide[s]' medical assistance" (Jeannot v New York State, ___ F Supp 3d ___, ___, 2025 WL 80689, *14 [EDNY 2025], quoting 42 USC 1396a[a][23]). Because FIs do not provide medical assistance, FIs do not fall within the zone of interests intended to be protected by the Freedom of Choice Provision. "Courts addressing the zone of interests of the Freedom of Choice Provision have been clear that even entities that do provide medical assistance are not within the zone of interests intended to be protected by the Freedom of Choice Provision, which was intended to protect consumers" (Jeannot v New York State, ___ F Supp 3d at ___, 2025 WL 80689, *14 [internal quotation marks and citations omitted]; see Catanzano v Wing, 992 F Supp 593, 595 [WDNY 1998][holding that "the legislative history" of the Freedom of Choice Provision "indicates that it is intended to confer rights upon health care recipients, not providers"]). Accordingly, the Court finds that petitioner has failed to establish a likelihood of success on its claim that the statutory amendments are preempted by the Medicaid Law.

**Affordable Care Act and the ADA**

To the extent that respondents actions are alleged to have placed consumers at risk of institutionalization in violation of the Affordable Care Act and the ADA, the Court finds that any such allegation is speculative. Accordingly, the Court finds that petitioner has failed to establish

27

a likelihood of success on its claims that the statutory amendments and the RFP violate the Affordable Care Act and the ADA.

Accordingly, and fatally, the Court finds that petitioner has failed to establish the likelihood of success on its petition and, for this reason alone, petitioner's application is denied.

### B. **Irreparable Injury and Balancing of the Equities**

However, in considering the remaining factors applicable to the petitioner's applications, "the threat of financial injury to [petitioner] is not alone sufficient to warrant preliminary injunctive relief where the injury is measured against the threat of injury to a public interest which, though perhaps less amenable to quantitative measurement, has been determined [to] outweigh commercial interests" (Mariculture Ltd. v Biggane, 48 AD2d 295, 298 [3d Dept 1975]; see Delaware County Bd. of Supervisors v New York State Dept. of Health, 81 AD2d 968, 970 [3d Dept 1991]). In light of the public interest in regulating the FI industry, reducing administrative costs, and using those savings to benefit Medicaid consumers, the Court finds that petitioner's claims of financial injury do not establish the requisite irreparable harm that would warrant the issuance of a preliminary injunction in its favor.

Likewise, the Court finds that the balance of the equities weighs in favor of denying petitioner's application for a preliminary injunction. "In considering this element when 'ruling on a motion for a preliminary injunction, the courts must weigh the interests of the general public as well as the interests of the parties to the litigation' [ ]. In balancing the equities, a court must inquire into whether 'the irreparable injury to be sustained . . . is more burdensome [petitioner] than the harm caused to [] through imposition of the injunction'" (Eastview Mall, LLC v Grace Holmes, Inc., 182 AD3d 1057, 1059 [4th Dept 2020], quoting Destiny USA Holdings, LLC v Citigroup

28

Global Mkts. Realty Corp., 69 AD3d 212, 223 [4th Dept 2009], lv dismissed 85 AD3d 1656 [4th

Dept 2011]; see Felix v Brand Serv. Group LLC, 101 AD3d 1724, 1726 [4th Dept 2012]). If the

preliminary injunction were granted the State would be required to find $200 million dollars – the

amount of savings to the CDPAP Program through the statutory amendments - to fund the CDPAP

Program this year. Thus, the Court concludes that the balancing of the equities weighs in

respondents' favor.

 Accordingly, on the record before the Court, and in considering the factors relevant to the

relief sought by the parties, the Court, in its discretion, denies petitioner's application for a

preliminary injunction.

 This constitutes the Decision and Order of the Court, which will be uploaded to the New

York State Court's Electronic Filing System (NYSCEF).  Counsel is advised of 22 NYCRR

202.5-b (h) (2) relating to notice of entry.

SO ORDERED AND ADJUDGED

ENTER.

Dated: Albany, New York
   February 7, 2025

          _____
          Hon. James H. Ferreira
          Acting Justice of the Supreme Court

Papers Considered:
NYSCEF Documents Numbered: 1-13, 19-47, 65.