UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

GLIDEDOWAN, LLC D/B/A
ALL-AMERICAN HOMECARE AGENCY, INC.,

                    Plaintiff,              **DECISION AND ORDER**

          v.                                6:24-CV-06731 EAW

NEW YORK STATE DEPARTMENT OF
HEALTH, and JAMES V. MCDONALD,
in his official capacity as the Commissioner
of the New York State Department of Health,

                    Defendants.
_____

## <u>INTRODUCTION</u>

Plaintiff Glidedowan, LLC, d/b/a All-American Homecare Agency, Inc. ("Plaintiff") brings this action against defendants the New York State Department of Health ("NYSDOH" or "DOH") and James V. McDonald (collectively, "Defendants"), alleging that Defendants' anticipated implementation of amendments to Section 365-f of the New York State Social Services Law, violates Plaintiff's rights under the Equal Protection, Contracts, Due Process, Takings, Commerce, and Bill of Attainder Clauses of the United States Constitution. (Dkt. 1). Presently before the Court is Plaintiff's motion for a preliminary injunction (Dkt. 2), Defendants' response (Dkt. 20), Plaintiff's reply (Dkt.

- 1 -

25)[1], and Defendants' sur-reply (Dkt. 23)[2].  The Court held oral argument on February 5, 2025, and reserved decision.  (Dkt. 26; *see also* Dkt. 28 (transcript from February 5, 2025 oral argument)).  After oral argument, the parties filed letters alerting the Court to decisions issued by other courts related to the issues in this litigation.  (Dkt. 27; Dkt. 29; Dkt. 30; Dkt. 31).  For the following reasons, Plaintiff's motion for a preliminary injunction (Dkt. 2) is denied.[3]

## **BACKGROUND**

The following factual background is taken from Plaintiff's complaint (Dkt. 1), the declaration of Marco C. Altieri, Plaintiff's Chief Executive Officer (Dkt. 2-2), and the declaration of Amir Bassiri, the Deputy Commissioner of the Office of Health Insurance Programs at the NYSDOH (Dkt. 20-3).

Plaintiff seeks to enjoin the implementation of a new scheme for the delivery of services in the New York State Consumer Directed Personal Assistant Program ("CDPAP").  (Dkt. 1 at ¶ 1).  The Court hereinafter refers to this new scheme as "the amendments," or the "CDPAP amendments."  CDPAP allows Medicaid beneficiaries who are eligible for home care to self-direct their own care.  (*Id*. at ¶¶ 3, 17).  The amendments,

---

[1]     Plaintiff's initial reply was filed at Docket 22.  On January 31, 2025, five days before the oral argument, Plaintiff filed a corrected memorandum of law at Docket 25.

[2]     The Court granted Defendants' request to submit sur-reply papers at oral argument (*see* Dkt. 28 at 11), and the Court has considered the sur-reply.

[3]     In connection with its motion for a preliminary injunction, Plaintiff also filed a motion to expedite.  (*See* Dkt. 3).  The motion to expedite was effectively granted based on the Court's briefing schedule.  Thus, the Court terminates that motion.

passed and signed into law through amendments to New York Social Services Law § 365- f in April 2024, are scheduled to take effect on April 1, 2025, and would restrict the use of Fiscal Intermediaries ("FIs") throughout New York.  (*Id*. at ¶ 5).  FIs provide financial management and other support services to eligible individuals ("consumers").  (*Id*. at ¶¶ 36-39).  Consumers select, train, and manage their Personal Assistants ("PAs") who, in turn, provide home care services to the consumers.  (*Id*. at ¶¶ 30-32).  The FIs provide the administrative and other support, such as billing, payroll, and regulatory alignment, necessary to support consumer self-direction.  (*Id*. at ¶ 38).  Plaintiff is an FI, and has contracts with insurance carriers in approximately twenty counties, spanning from Buffalo to Watertown and the Capital Region, and including 3.1 million people.  (*Id*. at ¶¶ 40-42).

Prior to April 2025, consumers can select from hundreds of state-approved FIs, and may change FIs at any time.  (*Id*. at ¶¶ 4, 31).  But under the amendments, New York announced it would restrict the provision of all FI services in New York to one provider, beginning on April 1, 2025.  (*Id*. at ¶¶ 47-49, 51).  That provider "must have been operating on a 'statewide basis in at least one other state'" and it also must have been "'currently engaged in a contract with the single State agency established or designated to administer or supervise the administration of the State's Medicaid program in a state other than New York. . . .'"  (Dkt. 20-3 at ¶ 41).

New York ultimately awarded this contract to a company called Public Partnerships, LLC ("PPL").  (Dkt. 1 at ¶ 66).  Plaintiff's contracts are its only source of revenue.  (*Id*. at ¶¶ 45-46).  Once the amendments go into effect, they will nullify Plaintiff's contracts effective April 1, 2025.  (*Id*. at ¶ 51).  Plaintiff contends that this will drive many FIs in the

state, including itself, out of business, because it will not be permitted to fulfill its contracts by delivering FI services.  (*Id*. at ¶ 50).

Plaintiff alleges that it submitted a timely bid to Defendants to become the statewide PPI providing services to New York.  (*Id*. at ¶ 62).  Yet because Defendants required bidders to perform statewide services in another state outside New York, and CDPAP services provided in New York would not be considered, Defendants did not consider Plaintiff's bid.  (*Id*. at ¶¶ 52, 65).  Plaintiff contends that the bidding process was "rigged," that Defendants had a "preselected winner," and that PLL had a relationship with SEIU Local 1199, a highly influential health care workers union, which strongly urged the enactment of the amended statute.  (*Id*. at ¶¶ 53-59).  Plaintiff contends that SEIU 1199 is a political supporter of Governor Hochul, and that for decades SEIU has believed that organizing a single FI would be substantially easier for SEIU 1199 than organizing several hundred separate entities spread across the state.  (Dkt. 2-2 at ¶¶ 47-58).

Defendants describe New York's prior FI model as an "extreme outlier when compared to the rest of the nation," with an estimated 600 FIs operating in the state.  (Dkt. 20-3 at ¶¶ 7-8, 23).  Most states with a CDPAP program have less than three FIs statewide, and many states have just one.  (*Id*. at ¶ 8).  Defendants contend that the high number of FIs has created inefficiencies and hindered program monitoring and integrity efforts, including false and misleading marketing and solicitation to consumers of the program.  (*Id*. at ¶¶ 9-10, 25).  This leaves consumers confused about the process and criteria necessary to qualify for benefits, which is overseen by Managed Care Organizations ("MCOs") and local departments of social services ("LDSS"), not FIs.  (*Id*. at ¶ 10).

Defendants further contend that there are significant disparities among operating FIs, such as different wage and benefits packages, inconsistent messaging and application of overtime policies, varying training programs and support services, and inconsistent compliance in maintaining accurate records.  (*Id*. at ¶ 11).  In addition, consumers are limited by their region in their choices of FIs with cultural or linguistic experience.  (*Id*.).  Finally, with more FIs than the rest of the country combined, New York pays an excessively high administrative rate to FIs, resulting in CDPAP becoming prohibitively expensive.  (*Id*. at ¶ 12).  New York's administrative rate is more than double the average rate paid by other state Medicaid agencies in states with similar programs and costs of living, such as Massachusetts.  (*Id*.).

Defendants explain that, under the current CDPAP model where many FIs provide fiscal services to consumers, the FIs contract directly with MCOs and LDSS to act as administrative agents.  (*Id*. at ¶ 13).  FIs are <u>not</u> required to be licensed or to register with New York or the NYSDOH.  (*Id*.).  As a result, under the current, pre-CDPAP amendment statute, the NYSDOH has no ability to effectively regulate FIs through customary governmental mechanisms—such as by levying penalties and sanctions, pulling registration or licenses, or otherwise removing bad actors from the marketplace.  (*Id*.). Defendants further argue that this decentralized approach has negative fiscal consequences for CDPAP, since NYSDOH cannot control the number of FIs in the market, anticipate rising CDPAP costs, or explain CDPAP's rapid expansion.  (*Id*.).  Since 2017, there have been several legislative attempts to impose regulations on the FI market.  (*Id*. at ¶ 14).  For example, one amendment in 2019 aimed to significantly reduce the number of FIs that

could operate in CDPAP.  (*Id*.).  Although additional amendments in 2021 expanded the number of companies eligible to provide FI services, only FIs meeting certain requirements were permitted to continue operating as FIs for CDPAP after the 2021 amendment.  (*Id*.).

Defendants explain that, instead of taxpayer dollars paying for health services delivered to chronically ill and physically disabled New Yorkers, a substantial portion of CDPAP funding is paying for the excessive administrative fees of the current FI system. (*Id*. at ¶ 19).  Money spent on these administrative costs diverts funds away from personal care services, safety net hospitals, physician salaries, and group homes that care for people with intellectual and developmental disabilities.  (*Id*. at ¶ 20).  New York estimates that the transition to a single, statewide FI with subcontractors will reduce administrative costs from approximately eight percent to three percent of the current CDPAP spending.  (*Id*. at ¶ 22).  The CDPAP amendments are projected to save the New York State Medicaid Program $500 million annually.  (*Id*.).

Defendants explain that, with one statewide FI, the NYSDOH will have better oversight into the practices of both the statewide FI, subcontractors, and CDPAP generally, and therefore it will be able to monitor compliance with state and federal rules more effectively.  (*Id*. at ¶¶ 24-26).  Further, a single statewide FI with a limited number of subcontractors will simplify the CDPAP process for consumers.  (*Id*. at ¶ 27).  Consumers will no longer have to search for an FI willing to work with them or that meets their needs— rather, under the CDPAP amendments, once a consumer is approved for CDPAP through their LDSS or MCO and selects their preferred PA, the consumer will immediately begin working with the statewide FI.  (*Id*.).

On June 17, 2024, New York issued Request for Proposal (RFP) #20524—a competitive solicitation procurement method seeking "proposals for a specified service or technology, pursuant to which an award is made to the responsive and responsible vendor offering the best value." (*Id*. at ¶¶ 30, 32). Defendants state that New York engaged in extensive conversations with representatives of the Centers for Medicare and Medicaid Services ("CMS"), stakeholders, and representatives of other state Medicaid programs, to discuss the challenges and mistakes other states have faced when enacting similar changes to their CDPAP programs. (*Id*. at ¶ 31). The RFP sought competitive proposals from qualified bidders to serve as the statewide FI. (*Id*. at ¶ 32). Defendants explain that the bidding requirements for RFP #20524 were crafted in reliance on NYSDOH's prior experience and challenges in attempting to regulate the FI landscape. (*Id*. at ¶ 33).

For example, the bidding process was crafted to avoid bidders who may have conflicts of interest with Licensed Home Care Services Agencies ("LHCSAs"). (*Id*. at ¶¶ 35-40). LHCSAs offer home care services—such as nursing care, housekeeping, and personal care attendants—while FIs provide administrative services such as processing payments for PAs in CDPAP. (*Id*. at ¶¶ 35-36). Accordingly, an entity that is owned or controlled by an LHCSA, but also serves as an FI, "would in essence be providing care services and then subsequently processing payments for those care services," and "[s]uch an entity could guide consumers of PAs to whichever arrangement financially benefits the company over the best interest of the consumer and PA." (*Id*. at ¶ 37). Defendants explain that this dynamic could give rise to an appearance of or an actual conflict of interest between the LHCSA's responsibility to offer home care services, and the FI's

responsibility to process administrative services. (*Id*.). Because the NYSDOH has not had the ability to regulate FIs, it also has not had the ability to monitor potential conflicts of interest between LHCSAs and FIs. Through issuance of RFP #20524, the NYSDOH sought to address the need to have better oversight into CDPAP through a single statewide FI, and to delineate the role of LHCSAs and FIs. (*Id*. at ¶¶ 38-39; *see also id*. at ¶ 40 ("In furtherance of DOH's obligation to protect taxpayer interests, which includes minimizing actual or perceived conflicts of interest RFP #20524, Section 4.5(d) required that the awarded Statewide FI could not be an entity that is owned or controlled by a LHCSA in New York or that owns or holds a controlling interest in a LHCSA in New York.")).

Another requirement for the awarded statewide FI was that it must have been operating on a "statewide basis in at least one other state," and was "currently engaged in a contract with the single State agency established or designated to administer or supervise the administration of the State's Medicaid program in a state other than New York, to be a provider of fiscal intermediary services throughout the entire geographic area of the subject state." (*Id*. at ¶ 41). Defendants explain that while there are New York-based FIs that operate in every county, there is a difference between maintaining a local presence in every county and providing FI services to a state's entire Medicaid CDPAP program. (*Id*. at ¶ 43). Accordingly, RFP #20524 required bidders to have the experience necessary to run a statewide FI by having a contract with another state's Medicaid program to provide FI services throughout the entire state. (*Id*.).

In addition, before the CDPAP amendments, FIs contracted directly with MCOs and LDSS to act as administrative agents, and the FIs were not required to be licensed or

registered with the State or NYSDOH in any way. (*Id*. at ¶ 44). However, Defendants explain that Medicaid is a technical and specialized program that requires strict adherence to federal regulations and policies, and FIs that are contracted with another state's Medicaid agency have experience working within the Medicaid framework. (*Id*. at ¶ 45).

Finally, the legislature recognized that many current New York FIs could not meet the requirements to become the statewide FI. (*Id*. at ¶ 50). To ensure that some New York-based FIs could continue to provide services, the CDPAP amendments provided for "at least one entity per rate setting region that has a proven record of delivering services to individuals with disabilities and the senior population, and has been providing fiscal intermediary services since January first, two thousand twelve" with demonstrated cultural and linguistic competency. (*Id*.). In other words, New York FIs can provide services as subcontractors. (*Id*. at ¶ 51). The 2012 requirement applies only to those FIs that the statewide FI must choose as subcontractors, *i.e.*, the subcontractors for each of the four rate-setting regions, and the statewide FI may choose to subcontract with additional FIs, even if the subcontracting FI was not in business prior to 2012. (*Id*. at ¶ 52). All subcontracting FIs are also subject to the respective requirements and limitations set forth in the amendments, including conflicts of interest, and are further subject to DOH review and approval. (*Id*. at ¶ 53).

Defendants contend that by the bid deadline of August 21, 2024, the NYSDOH had received 136 bids in response to RFP #20524. (*Id*. at ¶ 73). Following the compliance evaluation and the technical and cost evaluations of all responsive bids, the final evaluation scores were added together for a total bid score, with PPL receiving the highest total bid

score of 100 points.  (*Id*. at ¶ 89).  The NYSDOH informed PPL that it was selected as the statewide FI on September 27, 2024.  (*Id*. at ¶ 92).  PPL is a financial management service company and provides administrative services for self-directed care in 21 states.  (*Id*. at ¶ 96).  It has established contracts with 15 state Medicaid programs to provide services like FI services, including states with Medicaid programs the size of New York's program.  (*Id*. at ¶ 97).

PPL is in the process of establishing its headquarters in New York, where it is expected to create 1,200 new jobs.  (*Id*. at ¶ 98).  Defendants explain that the transition to PPL as the statewide FI has already begun, and that any delay in the transition of implementation of the CDPAP amendments will cause immediate harm to New York Medicaid recipients, including disruptions in consumer care and PA access to pay.  (*Id*. at ¶¶ 109, 115-29).

Finally, Defendants state that, beginning on April 1, 2025, the state anticipates that the switch to a single statewide FI will achieve $500 million in savings annually, and if the Court was to grant the preliminary injunction and push the transition timeline back further, the state would not achieve these potential savings.  (*Id*. at ¶¶ 130-31).  To compensate for the loss of the savings contemplated by the CDPAP amendments, the state would need to achieve $500 million in state savings annually for the Medicaid program.  (*Id*. at ¶ 132).

## DISCUSSION

Plaintiff argues that it is entitled to injunctive relief because Defendants have threatened it with two types of irreparable harm: (1) destruction of its business, and (2) violation of its constitutional rights. (Dkt. 2-4 at 10). As for the first argument based on destruction of its business, Plaintiff argues that on April 1, 2025, Defendants will nullify Plaintiff's contracts and prohibit Plaintiff from providing FI services. *See, e.g.*, *Blossom S., LLC v. Sebelius*, No. 13-CV-645L, 2013 WL 4679275, at *1 (W.D.N.Y. Aug. 30, 2013) ("The total destruction of a business has been held to constitute irreparable harm."). Plaintiff further argues that the passage of Section 365-f will violate Plaintiff's constitutional rights under: (1) the Equal Protection Clause; (2) the Contracts Clause; (3) the Due Process Clause; (4) the Takings Clause; (5) the Commerce Clause; and (6) the Bill of Attainder Clause of the United States Constitution, and therefore it is entitled to a preliminary injunction.

In response, Defendants argue that Plaintiff cannot demonstrate that it will suffer a "total loss" or at least one that cannot otherwise be compensated by monetary remedy, and thus it cannot show irreparable harm. (Dkt. 20-12 at 13). Defendants also argue that Plaintiff cannot demonstrate that its alleged constitutional injuries are likely to have success on the merits. (*Id.*). Further, Defendants submit that Plaintiff's claims against the NYSDOH must be dismissed on sovereign immunity grounds. (*Id.* at 12-13).

## I.    Sovereign Immunity

Before turning to the merits of the preliminary injunction motion, the Court first addresses an issue raised by Defendants—specifically, whether Plaintiff's claims against

the NYSDOH brought pursuant to 42 U.S.C. § 1983 must be dismissed on sovereign immunity grounds under the Eleventh Amendment.    Plaintiff does not address this argument in its reply papers.[4]  (Dkt. 25).  At oral argument, Plaintiff confirmed that the NYSDOH is not a proper party to this action.  (Dkt. 28 at 11-12).  Plaintiff further confirmed that, as currently pleaded, the only proper defendant is Dr. McDonald in his official capacity, to the extent Plaintiff seeks prospective injunctive relief.  (*Id.*).

There being no opposition to Defendants' argument that the claims against the NYSDOH must be dismissed on sovereign immunity grounds, the Court dismisses Plaintiff's claims against the DOH, and declines to grant injunctive relief against it.[5]  *See, e.g.*, U.S. Const. amend. XI; *see also Leitner v. Westchester Cmty. Coll.*, 779 F.3d 130, 134-35 (2d Cir. 2015); *Cincotta v. N.Y.C. Hum. Res. Admin.*, No. 00-cv-9064, 2001 WL 897176, at *9 (S.D.N.Y. Aug. 9, 2001) ("OTDA and [the New York State Department of Health] are agencies of New York State and thus cannot be sued under Section 1983 and are otherwise immune from suit in federal court under the Eleventh Amendment for the alleged claims in this case.").

---

[4]    In its initially filed reply papers, Plaintiff removed the NYSDOH as a defendant to this action and added Michael Lewandowski, a representative of the DOH's Office of Health Insurance Programs.  (*See* Dkt. 22 at 1).  Plaintiff's corrected reply papers retained the original caption.  (Dkt. 25).  At oral argument, Plaintiff's counsel confirmed that the addition of Mr. Lewandowski was an error, and it was not seeking to add him as a defendant in the action.  (*See* Dkt. 28 at 11-12).

[5]    Despite the dismissal of the DOH, the Court will continue to refer to "Defendants" throughout this Decision and Order for consistency purposes.

## II.    **Preliminary Injunction**

The Court turns next to considering whether Plaintiff has shown that it is entitled to injunctive relief.[6]

### A. **Legal Standard**

"To obtain a preliminary injunction that 'will affect government action taken in the public interest pursuant to a statute or regulatory scheme, the moving party must demonstrate (1) irreparable harm absent injunctive relief, (2) a likelihood of success on the merits, and (3) public interest weighing in favor of granting the injunction.'" *We the Patriots USA, Inc. v. Hochul*, 17 F.4th 266, 279 (2d Cir. 2021) (quoting *Agudath Israel of Am. v. Cuomo*, 983 F.3d 620, 631 (2d Cir. 2020)). "The movant must also show that the balance of equities supports the issuance of an injunction." *Id*. at 280 (citing *Yang v. Kosinski*, 960 F.3d 119, 127 (2d Cir. 2020)). A preliminary injunction is "an extraordinary

---

[6]    The Court is aware of five decisions addressing challenges to the implementation of the CDPAP amendments and denying preliminary injunctions: *Principle Homecare, LLC v. McDonald*, No. 24-CV-07071 (MMG), 2025 WL 622876 (S.D.N.Y. Feb. 26, 2025), *appeal filed*, 25-466 (2d Cir. Feb. 27, 2025); *Jeannot v. New York*, No. 24-CV-05896 (HG), 2025 WL 80689 (E.D.N.Y. Jan. 13, 2025), *appeal filed*, 2025 WL 80689 (2d Cir. Feb. 12, 2025); *Glidedowan v. AASHA Servs., Inc.*, Index No. 000009-2025 (Sup. Ct., Livingston Cnty. Feb 21, 2025); *Save Our Consumer Directed Home Care Program, Inc. v. NYSDOH*, Index No. 907872-24, ___ N.Y.S.3d ____, 2025 WL 517961 (Sup. Ct., Albany Cnty. Feb. 7, 2025); *Corning Council for Assistance and Info. for the Disabled v. McDonald*, Index No. 908147-24 (Sup. Ct., Albany Cnty. Sept. 30, 2024).

In addition, Plaintiff has cited two cases granting temporary restraining orders in favor of the plaintiffs: *Caring Professionals, Inc. v. NYSDOH*, Index No. 601181/2025 (Sup. Ct., Nassau Cnty. Jan. 27, 2025) and *Maxim of N.Y., LLC v. NYSDOH*, Index No. 602917/2025 (Sup. Ct., Nassau Cnty. Feb. 13, 2025), but in each case the relief granted was drawn narrowly and essentially limited to preventing the NYSDOH from sanctioning the plaintiffs for failing to meet directives to transfer data.

and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Moore v. Consol. Edison Co. of N.Y.*, 409 F.3d 506, 510 (2d Cir. 2005) (quoting *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997)). The Court "has wide discretion in determining whether to grant a preliminary injunction[.]" *Id.* at 511.

### B. Irreparable Harm

"The irreparable harm requirement is the single most important prerequisite for the issuance of a preliminary injunction," and thus it must "be satisfied before the other requirements for an injunction can be considered." *State Farm Mut. Auto Ins. Co. v. Tri-Borough NY Med. Prac. P.C.*, 120 F.4th 59, 80 (2d Cir. 2024) (quotations and citations omitted). The Second Circuit has explained that "to satisfy the irreparable harm requirement, plaintiffs must demonstrate that absent a preliminary injunction they will suffer an injury that is neither remote nor speculative, but actual and imminent, and one that cannot be remedied if a court waits until the end of trial to resolve the harm." *Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir. 2009) (quotations, citations, and alterations omitted). "Where there is an adequate remedy at law, such as an award of money damages, injunctions are unavailable except in extraordinary circumstances." *Id.*

Defendants, while acknowledging that the total loss of a business can constitute irreparable harm, argue that those cases typically involve "one product" companies that have lost all opportunity to continue their business. (*See* Dkt. 20-12 at 14 (collecting cases)). But where businesses have retained some avenue for continued activity, the loss

of the business has not been deemed "total" for preliminary injunctive relief purposes. (*Id*.).

Defendants further argue that Plaintiff undercuts its own assertion of irreparable injury by alleging, in connection with its Takings Clause argument, the full value of its business—in other words, Plaintiff's argument concedes that an award of money damages is available and therefore injunctive relief is not necessary. (*See* Dkt. 20-12 at 16). But the Court does not find this argument persuasive. While it is true that "where an injury is compensable through money damages there is no irreparable harm," *see Vera, Inc. v. Tug Dakota*, 769 F. Supp. 451, 454 (E.D.N.Y. 1991), Plaintiff may argue for alternative forms of relief, and the fact that it valued its contracts in the context of the Takings Clause argument is not dispositive of the preliminary injunction issue on the whole. Because Plaintiff has argued that the CDPAP amendments would prohibit it from doing business in New York, the alleged harm arguably extends beyond monetary damages for its current contracts.

Plaintiff argues that it has shown irreparable harm by identifying certain constitutional injuries it has allegedly suffered. But simply identifying alleged constitutional violations, as Plaintiff has done in its moving papers, is insufficient. Rather, when relying on a constitutional harm to support a showing of irreparable injury, "a mere assertion of a constitutional injury is insufficient to automatically trigger a finding of irreparable harm." *Goldstein v. Hochul*, 680 F. Supp. 3d 370, 389 (2d Cir. 2023) (quotations and citation omitted). A plaintiff also must "show a likelihood of success on the merits of their constitutional claims to meet the irreparable injury prong to merit a

preliminary injunction." *Id.*; *see also Page v. Cuomo*, 478 F. Supp. 3d 355, 364 (N.D.N.Y. 2020) ("[W]hen a plaintiff seeks injunctive relief based on an alleged constitutional deprivation, the two prongs of the preliminary injunction threshold merge into one . . . in order to show irreparable injury, plaintiff must show a likelihood of success on the merits." (quotations and citation omitted)).  In other words, a violation of one's constitutional rights presumably causes irreparable harm.  But a plaintiff relying on violation of such rights in support of the irreparable injury suffered must show a likelihood of success on its constitutional claims.

There is at least some argument that Plaintiff has not shown a "total loss."  For example, Plaintiff may continue to operate as an FI under other state or federal programs. Further, the CDPAP amendments still permit New York FIs to serve as subcontractors for PPL.  That said, in reality, all of Plaintiff's existing contracts exist through the CDPAP program, and barring it from operating as an FI in connection with New York's CDPAP program will effectively put it out of business.  But even assuming that Plaintiff could establish irreparable harm, it cannot demonstrate a likelihood of success on any of its constitutional claims, and therefore the motion for injunctive relief must be denied.

### C.  Likelihood of Success on the Merits

As noted, even if Plaintiff demonstrated irreparable harm, the Court also must conclude that Plaintiff has shown a likelihood of success on the merits.  Accordingly, the Court examines each of Plaintiff's claims in turn.

## 1.  The Equal Protection Clause

Plaintiff contends that the CDPAP amendments create a monopoly that categorically excludes Plaintiff, and in doing so violates the Equal Protection Clause.  (Dkt. 2-4 at 11).  It argues that Defendants can offer no rational basis for creating a monopoly for FI services in New York, and then excluding Plaintiff from eligibility to bid for that monopoly because it is a New York FI and does not do business outside of New York.  In response, Defendants contend that Plaintiff's qualifications in relation to those of the selected statewide entity, PPL, do not yield a conclusion that the parties are similarly situated, and the basis for the distinctions drawn between them have a rational basis.  (Dkt. 20-12 at 20).  At oral argument, Plaintiff's counsel represented that, of all Plaintiff's claims, he believed that the Equal Protection claim had the most merit.  (Dkt. 28 at 34).

The Fourteenth Amendment's Equal Protection Clause states that no state shall "deny any person within its jurisdiction the equal protection of the laws."  U.S. Const. Amend. XIV, § 1.  Statutes that do not impact a protected class are reviewed for rational basis, which requires that "legislation is presumed to be valid and will be sustained if the classification drawn by the statute is rationally related to a legitimate state interest." *Windsor v. United States*, 833 F. Supp. 2d 394, 400 (S.D.N.Y. 2012) (citation omitted), *aff'd*, 699 F.3d 169 (2d Cir. 2012).  "The rational basis test is thus an extremely deferential standard.  It precludes second-guessing [a legislature's] 'wisdom, fairness, or logic of legislative choices.'"  *United States v. Amalfi*, 47 F.4th 114, 125 (2d Cir. 2022) (citation omitted).  The parties agree that rational basis is the proper standard of review for the legislation at issue.  (*See* Dkt. 28 at 18).

Plaintiff has failed to show a likelihood of success on its Equal Protection claim. First, as required for an Equal Protection claim, Plaintiff cannot show that it was treated differently than a similarly situated entity. As explained above, PPL possessed the requisite statewide experience that Plaintiff did not—in fact, at oral argument, Plaintiff conceded that nothing in the law or in the CDPAP amendments prevented Plaintiff from having the requisite out-of-state experience. (*See* Dkt. 28 at 20 (counsel agreeing that Plaintiff was not "restrict[ed] from going and operating in another state")).

Even if Plaintiff was similarly situated to businesses possessing the requisite statewide experience, Defendants have articulated that the CDPAP amendments are rationally related to a legitimate state interest. As detailed above in connection with the Bassiri declaration (Dkt. 20-3), Defendants have explained that the more than 600 FIs currently operating in New York have created high administrative costs and have spread misinformation. Further, because the FIs did not contract directly with NYSDOH, there was no ability to exercise oversight over these entities, including by preventing conflicts of interest.[7] Moving to one statewide FI will save an estimated $500 million annually, and it will also help to improve oversight, allow for more comprehensive auditing, and reduce conflicts of interest. On these grounds, other courts have concluded that Defendants have offered a rational basis for the CDPAP amendments. *See Principle Homecare, LLC*, 2025 WL 622876, at *16 (dismissing equal protection claim for failure to plausibly plead that

---

[7]    The legislative history for the CDPAP amendments references eliminating certain conflicts of interest between FIs and LHCSAs as one motivation for passage of the amendments. *See* 2023 New York Senate Bill No. 8307.

the CDPAP amendment lacked a rational basis); *Save Our Consumer Directed Home Care Program, Inc.*, 2025 WL 517961, at *13 (denying motion for preliminary injunction and, in addressing equal protection challenge, finding that the petitioner "failed to establish that the grounds for the mandate for the SFI to have out-of-state experience is without a rational basis"); Dkt. 20-1 at 8-9, *Corning Council for Assistance and Info. for the Disabled* (rejecting the petitioners' motion for a preliminary injunction, and in addressing their Equal Protection challenge, explaining that the amendment "does not favor providers with experience out of State over providers with experience in New York State. Rather, it seeks providers who have experience serving as a statewide FI in another state.").

At oral argument, Plaintiff offered that it is "utterly irrational for the statute to allow the selectors of the statewide contract to consider experience in Wyoming with a population of 500,000 and very different CDPAP services requirements, and not consider the experience of the State of New York with a population of . . . 20 million . . . and exactly the same CDPAP services that they are requiring the new contract winner to perform." (Dkt. 28 at 35). But Defendants have offered several rationales for requiring a provider with out-of-state experience. The rational basis test is an "extremely deferential standard," and "precludes second-guessing [a legislature's] 'wisdom, fairness, or logic of legislative choices." *Amalfi*, 47 F.4th at 125. The Court declines Plaintiff's invitation to second guess the legislature's choice here.

Plaintiff further argues that the rational basis offered by Defendants for the legislation is pretextual, and that politics was the true reason for the legislation. (*See, e.g.*, Dkt. 25 at 23 ("The true reason for the bidding restriction, of course, is not to ensure

compliance with Medicaid requirements. It's to clear the deck of New York applicants in order to make straight the way for Defendants' pre-selected winner, PPL."); *see also* Dkt. 28 at 13). Even accepting Plaintiff's contention about the political underpinnings of the CDPAP amendments, Plaintiff's argument about politics misses the mark. This is because under rational basis review,

> it is entirely irrelevant for constitutional purposes whether the conceived reason for the challenged distinction actually motivated the legislature. Thus, the absence of "legislative facts" explaining the distinction on the record, has no significance in rational-basis analysis. In other words, a legislative choice is not subject to courtroom fact-finding and may be based on rational speculation unsupported by evidence or empirical data.

*FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 314-15 (1993) (internal citations, quotations, and alterations omitted); *see also Amalfi*, 47 F.4th at 124-125 ("It is not enough for those attacking the rationality of the legislative classification to argue that Congress's *stated* reasons do not support the decision it made; rather, challengers have the burden to negative *every conceivable basis* which might support it. The rational basis test is thus an extremely deferential standard. It precludes second-guessing Congress's wisdom, fairness, or logic of legislative choices. Accordingly, if a classification's rationality is at least debatable, we must refrain from questioning Congress's judgment." (internal citations, quotations, and alterations omitted)); *Des Moines Midwife Collective, LLC v. Iowa Health Facilities Council*, No. 4:23-cv-00067-SMR-HCA, ___ F. Supp. 3d ____, 2024 WL 4763198, at *3 (S.D. Iowa Nov. 13, 2024) ("there is no requirement under rational basis review that the basis offered be the true motivating reason of the lawmaking body"). Accordingly, whether politics was the actual reason for the passage of the CDPAP amendments is largely

irrelevant to the Court's analysis. Because Defendants have presented a rational basis for the legislation—and in fact, they have presented several rational bases for the passage of the CDPAP amendments—Plaintiff cannot demonstrate a likelihood of success on the merits for its Equal Protection claim.

### 2. Contracts Clause

Plaintiff next argues that the CDPAP amendments force the nullification of its contracts in violation of the Contracts Clause of the United States Constitution. (Dkt. 2-4 at 12). In response, Defendants argue that the CDPAP amendments do not interfere with Plaintiff's contractual bargains, since the contracts themselves expressly provide for their termination if Plaintiff is barred from participating in a government program such as CDPAP. Defendants further argue that Plaintiff could not reasonably expect that its contracts would renew indefinitely given that they provide services for CDPAP, a heavily regulated government program for which the state has recently considered or enacted measures imposing additional regulation of the number of FIs. (*See* Dkt. 20-12 at 24).

The Contracts Clause states that "[n]o State shall . . . pass any . . . Law impairing the Obligation of Contracts." U.S. Const. art. I, § 10.

> Although facially absolute, the Contracts Clause's prohibition "is not the Draconian provision that its words might seem to imply." It does not trump the police power of a state to protect the general welfare of its citizens, a power which is "paramount to any rights under contracts between individuals." Rather, courts must accommodate the Contract Clause with the inherent police power of the state "to safeguard the vital interests of its people."

*Buffalo Teachers Fed'n v. Tobe*, 464 F.3d 362, 367 (2d Cir. 2006) (internal citations omitted).

"To determine if a law trenches impermissibly on contract rights, we pose three questions to be answered in succession: (1) is the contractual impairment substantial and, if so, (2) does the law serve a legitimate public purpose such as remedying a general social or economic problem and, if such purpose is demonstrated, (3) are the means chosen to accomplish this purpose reasonable and necessary." *Id*. at 368. States have broad power to enact laws to achieve legitimate ends "without worrying that in so doing private contracts may be impaired or even destroyed." *Sanitation & Recycling Indus., Inc. v. City of N.Y.*, 107 F.3d 985, 994 (2d Cir. 1997). "Otherwise . . . a person whose rights are subject to state restriction could remove them from the power of the State by making a contract about them." *Id*. (alterations and quotations omitted).

In considering the first prong—whether the impairment is substantial—the Court considers "the extent to which the law undermines the contractual bargain, interferes with a party's reasonable expectations, and prevents the party from safeguarding or reinstating his rights." *Melendez v. City of N.Y.*, 16 F.4th 992, 1033 (2d Cir. 2021) (citation omitted). And herein lies one issue with Plaintiff's argument. That is, Plaintiff's contracts with the MCOs are written for one-year terms. Further, the contracts with the MCOs permit either party to terminate on 60 days' notice without cause—and therefore, MCOs contracting with Plaintiff could terminate their contracts for services under the explicit terms of the agreement. (*See* Dkt. 20-3 at ¶ 113; *see also* Dkt. 20-10 (Administrative Agreement)). When questioned about this issue at oral argument, Plaintiff's counsel agreed that the contracts were "from year to year." (Dkt. 28 at 29). In other words, under its own contracts with the MCOs, Plaintiff was not guaranteed continuing business—and therefore it could

not have a reasonable expectation that its services would continue indefinitely under the contracts.

Further, Plaintiff's contracts with the MCOs state that they will terminate automatically if either party is barred from participating in any government health care program. (*See* Dkt. 20-3 at ¶¶ 110-11 (Bassiri declaration, explaining that "FI contracts with MCOs were based on the model contract provided to the industry," and "Plaintiff's contract tracks the model contract published by DOH and circulated to MCOs," including that the contracts expressly state that they terminate automatically and immediately if Plaintiff is barred from participating in a government health care program)). Accordingly, Plaintiff bargained for and agreed to comply with any changes to state law and the Medicaid program. To that end, "Plaintiffs are involved in a heavily-regulated industry . . . and cannot claim surprise that their contractual relationships . . . are affected by governmental action." *Bldg. & Realty Inst. of Westchester & Putnam Cnty., Inc. v. New York*, No. 19-CV-11285 (KMK), 2021 WL 4198332, at *34 (S.D.N.Y. Sept. 14, 2021) (quotations, citation, and alterations omitted), *aff'd*, 2024 WL 1061142 (2d Cir. Mar. 12, 2024); *see also All. of Auto. Mfrs., Inc. v. Currey*, 984 F. Supp. 2d 32, 54 (D. Conn. 2013) ("Where, as here, the industry has been heavily regulated, and regulation of contracts is therefore foreseeable, a party's ability to prevail on its Contracts Clause challenge is greatly diminished."), *aff'd*, 610 F. App'x 10 (2d Cir. 2015).

Even if Plaintiff had shown a substantial contractual impairment, it has not established that the law at issue did not serve a legitimate public purpose. As explained above, the number of FIs operating in New York have created high administrative costs

and spread misinformation.  Further, moving to one statewide FI will save New York an estimated $500 million annually, and it will also help to improve oversight over FIs, allow more comprehensive auditing, and reduce conflicts of interest.  *See, e.g.*, *Save Our Consumer Directed Home Care Program, Inc.*, 2025 WL 517961, at *14 (finding that the petitioner failed to establish a likelihood of success on the merits of its Contract Clause claim, including because respondents articulated a "legitimate public purpose in enacting the statutory amendments – to regulate the FI industry, minimize cost, and save money that can be used to provide services to Medicaid consumers"); *see also Principle Homecare, LLC*, 2025 WL 622876, at *14 ("The Court finds that Plaintiffs have not plausibly pled their Contracts Clause claims, whether facially or as-applied, and the motion to dismiss those claims is granted.").  For those reasons, the Court concludes that Plaintiff cannot demonstrate a likelihood of success on the merits for its Contracts Clause claim.

### 3. Due Process Clause

Plaintiff's next argument is that Defendants' destruction of Plaintiff's business violates the Due Process Clause.  (Dkt. 2-4 at 13-14).  Plaintiff argues that the passage of Section 365-f will wipe out all of New York's FIs in favor of a single out-of-state FI, and that New York's decision to pass the amendments is "arbitrary and unconnected to any legitimate regulatory purpose." (*Id*. at 14).  In response, Defendants contend that Plaintiff cannot demonstrate a likelihood of success on the merits with respect to its Due Process claim, since there is no "property interest" at stake here, nor would any such interest be sufficient to outweigh the rational basis underlying the amendments.  (Dkt. 20-12 at 17).

For the following reasons, the Court concludes that Plaintiff has failed to show a likelihood of success on its Due Process claim.

"The law in this Circuit is clear that where . . . a statute neither interferes with a fundamental right nor singles out a suspect classification, we will invalidate that statute on substantive due process grounds only when a plaintiff can demonstrate that there is no rational relationship between the legislation and a legitimate legislative purpose." *Molinari v. Bloomberg*, 564 F.3d 587, 606 (2d Cir. 2009) (quotations, citations, and alterations omitted). Plaintiff does not have a fundamental right to contract as an FI and receive Medicaid money. This is because Medicaid reimbursement changes "cannot form the basis of a substantive due process claim" where the state has a legitimate purpose. *In re NYAHSA Litig.*, 318 F. Supp. 2d 30, 41 (N.D.N.Y. 2004), *aff'd sub. nom.*, *N.Y. Ass'n of Homes & Svcs. For the Aging, Inc., v. DeBuono*, 444 F.3d 147 (2d Cir. 2006). Further, even if Plaintiff did have a fundamental right, the CDPAP amendments are rationally related to a legitimate government interest in saving taxpayer money and preventing waste and fraud in New York's healthcare system. *See id.* at 41 (noting that control of Medicaid costs is "a legitimate and laudable objective of the State"). Other courts examining this issue in the context of the CDPAP amendments have reached the same conclusion. *See, e.g.*, *Principle Homecare, LLC*, 2025 WL 622876, at *16 (dismissing plaintiffs' substantive due process claim because there was no plausible allegations of a deprivation of property); *Jeannot*, 2025 WL 80689, at *14 ("To the extent the Agency Plaintiffs are arguing that the CDPAP Law violates their due process rights by excluding them from being among the FIs that the Consumer Plaintiffs can select to administer their CDPAP benefits, such a claim must fail

because the Agency Plaintiffs do not possess a constitutionally protected property interest conferred by the relevant section of the Medicaid Act."); *see also* Dkt. 20-1 at 9-10, *Corning Council for Assistance and Info. for the Disabled, Inc.* (rejecting due process claim, and explaining that "Petitioners do not allege that a property interest is implicated by [the amendments].   Further, the statute does not exclude New York experience, it requires a provider to have experience as a single statewide FI.   The justification for this is . . . to minimize service disruption as this State moves to the single statewide FI provider model.")).

In connection with its Due Process Clause argument, Plaintiff attacks the validity of New York's bidding process for the statewide FI.   Specifically, Plaintiff contends that Defendants "fabricated bidding standards" and did not disclose the RFP scoring system, and that "the combination of all these procedural sins" violates its due process rights.   (Dkt. 25 at 24, 27).   At oral argument, Plaintiff's counsel argued that the Court should consider such allegations only in connection with the constitutional analysis, and that any claim for failure to follow established state law contracting processes was not part of the claims before this Court.   (Dkt. 28 at 36).

The Court is not clear how any "bid rigging" challenge, standing alone, would amount to a federal constitutional issue.   Such challenges are traditionally brought in connection with an Article 78 proceeding. *See, e.g.*, *J.P.R. Cafeteria, Inc. v. Kingsborough Comm. Coll. of City Univ. of N.Y.*, 847 N.Y.S.2d 902, 2007 WL 2385083, at *7 (Sup. Ct., Kings. Cnty. Aug. 21, 2007) ("Plaintiffs' attempt to challenge the fairness of the bidding process and to allege claims of misconduct in the process is properly the subject to a CPLR

article 78 proceeding."); *see also Bison Elevator Serv., Inc. v. City of Buffalo*, 170 A.D. 3d 1567 (4th Dep't 2019) (reviewing Article 78 proceeding brought by plaintiff, seeking to annul award of elevator maintenance contract). In any event, Plaintiff's contention that the bidding process was "rigged" does not change the Court's analysis of Plaintiff's likelihood of success on its Due Process claim.

### 4. The Takings Clause

Plaintiff's next argument is that Defendants' elimination of Plaintiff's property rights without compensation violates the Takings Clause. (Dkt. 2-4 at 14). Plaintiff contends that, by giving PPL a monopoly on all FI work in New York, Defendants will effectively appropriate Plaintiff's contracts and deliver them to another private party. In response, Defendants contend that Plaintiff has failed to identify a protectible property interest, and that Plaintiff is not subject to a taking. (Dkt. 20-12 at 37-44).

The Fifth Amendment's Takings Clause provides that private property shall not be taken for public use without just compensation. U.S. Const. Amend. V. To succeed on a claim for violation of the Takings Clause, a plaintiff must show: "(1) that they have a property interest protected by the Fifth Amendment, (2) that they were deprived of that interest by the government for public use, and (3) that they were not afforded just compensation." *Ganci v. N.Y.C. Trans. Auth.*, 420 F. Supp. 2d 190, 195 (S.D.N.Y. 2005), *aff'd*, 163 F. App'x 7 (2d Cir. 2005).

Plaintiff has failed to identify a protectible property interest under the Takings Clause. This is because a party does not have a property interest in future Medicaid payments. *See, e.g.*, *Concerned Home Care Providers, Inc. v. Cuomo*, 783 F.3d 77, 91-92

(2d Cir. 2015) ("[i]t is fundamental that a Medicaid provider has no property interest in or contract right to reimbursement at any specific rate or, for that matter, to continued participation in the Medicaid program at all" (citation omitted)); *see also Daniel v. NYSDOH*, No. CV 21-4097 (DG)(AYS), 2022 WL 21781460, at *11 (E.D.N.Y. Aug. 27, 2022) ("At the outset, the Second Circuit and the New York Court of Appeals have clearly stated that providers have no cognizable property interest in continued participation as a Medicaid provider, nor in future Medicaid reimbursements. . . ." (internal citations omitted)), *aff'd*, 2024 WL 2131446 (2d Cir. May 13, 2024).  Given this case law, the Court finds it difficult to discern how Plaintiff could demonstrate success on the merits on its Takings Clause claim.  Further, as explained above, the contracts themselves are terminable without cause on 60 days' notice, which also cuts against the contracts constituting a constitutionally protected property interest.  *See, e.g.*, *A.F.C. Enters. v. N.Y.C. City Sch. Constr. Auth.*, No. CV-98-4534 CPS, 1999 WL 1417210, at *10 (E.D.N.Y. June 29, 1999) ("The Second Circuit has repeatedly rejected attempts to expand simple contract disputes to federal constitutional claims, and has repeatedly reaffirmed the principle that contractors do not acquire protected property rights in terminable or future contracts." (internal citations omitted)).

Perhaps recognizing that legal precedent is stacked against it, in response to Defendants' Takings Clause argument, Plaintiff pivots by arguing that its consumer and PA data "enjoys special protection under the Takings Clause because it constitutes a trade secret." (Dkt. 25 at 11).  Notably, Plaintiff does not reference that it is pursuing relief on this distinct legal basis in its complaint—indeed, the words "trade secret" appear nowhere

in its pleading.  Further, despite having the opportunity to do so, Plaintiff did not raise the trade secrets issue in its memorandum of law in support of its motion for a preliminary injunction.  At oral argument, Plaintiff's counsel stated that the trade secret argument responded to Defendants' concerns about the lack of a protectable property interest, but failed to explain why Plaintiff did not advance this argument sooner, including in light of the fact that such a claim based on consumer and personal assistant data and personnel records has been separately pursued in a related litigation in Livingston County.  (Dkt. 28 at 25-27).  The reply papers for the first time raise the issue of the "special protection" under the Takings Clause for trade secrets—which, as noted above, serves as a distinct legal basis for relief—and Plaintiff spends several pages discussing why the consumer and customer lists qualify as a trade secret under state law.  Given the circumstances, it strains the bounds of reasonable advocacy for Plaintiff to assert that Defendants had notice of any such "trade secrets" claim based on its complaint, and the Court may dismiss the argument on that basis alone.

Even if Plaintiff had properly made this argument, Plaintiff has acknowledged that the Takings Clause claim is a claim for money damages, and accordingly it could not serve as the basis for the preliminary injunction.  (*See* Dkt. 28 at 34).  For those reasons, the Court concludes that Plaintiff has failed to show a likelihood of success on the merits for its Takings Clause claim, and even if it had, it would not warrant entry of a preliminary injunction.

### 5. The Commerce Clause

Plaintiff argues that Section 365-f interferes with its business and violates the Commerce Clause. (Dkt. 2-4 at 15). In response, Defendants contend that Plaintiff cannot show a likelihood of success on its Commerce Clause claim, including because the CDPAP amendments are not facially discriminatory toward out-of-state interests in favor of in-state economic interests, and even if they were, the local benefits outweigh any impact of the CDPAP amendments on interstate commerce. (Dkt. 20-12). Plaintiff states in its reply papers that its "claims under the Takings Clause, Contracts Clause, Commerce Clause, and Due Process Clause are all likely to succeed" (Dkt. 25 at 10), but Plaintiff does not mention the Commerce Clause anywhere in its brief, or make any argument in support of its entitlement to relief under the Commerce Clause.

The Commerce Clause provides Congress the authority to "regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes." U.S. Const. art. I, § 8, cl. 3. "A state statute or regulation may violate the dormant Commerce Clause only if it (1) clearly discriminates against interstate commerce in favor of intrastate commerce, (2) imposes a burden on interstate commerce incommensurate with the local benefits secured, or (3) has the practical effect of 'extraterritorial' control of commerce occurring entirely outside the boundaries of the state in question." *Selevan v. N.Y.S. Thruway Auth.*, 584 F.3d 82, 90 (2d Cir. 2009) (quotations and citations omitted); *see also Grand River Enters. Six Nations v. Boughton*, 988 F.3d 114, 123 (2d Cir. 2021).

As an initial matter, Plaintiff's argument is not that the CDPAP amendments favor intrastate commerce over interstate commerce—rather, its argument is the other way

around—that the CDPAP amendments favor out-of-state interests over intrastate interests. Accordingly, the CDPAP amendments arguably do not even implicate the dormant Commerce Clause.  At oral argument, Plaintiff's counsel could not provide the Court with any authority for applying the Commerce Clause in this way, stating only that it was "admittedly a unique situation."  (*See* Dkt. 28 at 19).

Further, nothing on the face of the CDPAP amendments implicates the in-state or out-of-state nature of the FIs.  Rather, the minimum qualification for the awarded statewide FI was that it must have been operating on a "statewide basis in at least one other state," and was "currently engaged in a contract with the single State agency established or designated to administer or supervise the administration of the State's Medicaid program in a state other than New York, to be a provider of fiscal intermediary services throughout the entire geographic area of the subject state."  (Dkt. 20-3 at ¶ 41).  By its very text, the CDPAP amendments do not require a specific domicile for any FI, or prohibit FIs that operate in New York State.[8]  Rather, the amendments require experience operating as a statewide FI outside of New York.  *See, e.g.*, *Save Our Consumer Directed Home Care Program, Inc.*, 2025 WL 517961, at *13 (finding no likelihood of success on the merits for Commerce Clause claim, and noting that "petitioner has failed to establish that the statutory amendments discriminate against or impose a burden on interstate commerce incommensurate with the local benefits secured, or that the amendments have the practical

---

[8]    At oral argument, defense counsel represented to the Court that there were some New York-based FI providers with statewide operations in other states, including Nevada and Arizona, that submitted a bid.  (*See* Dkt. 28 at 22).

effect of controlling commerce outside the State of New York.  There is no prohibition against an FI that operates in New York from applying to be the SFI, and respondents have articulated a rational basis for requiring that the bidding entity have out-of-sate experience").  Indeed, at oral argument, Plaintiff's counsel conceded that Plaintiff was not restricted or prevented from operating in another state.  (Dkt. 28 at 20).  For those reasons, the Court concludes that Plaintiff has failed to demonstrate a likelihood of success on its Commerce Clause claim.

### 6. Bill of Attainder

Plaintiff's final argument in support of a preliminary injunction is that "Defendants' punitive acts" constitute a Bill of Attainder.  (Dkt. 2-4 at 16).  In response, Defendants contend that nothing in the CDPAP amendments constitutes a "punishment," as is required by a Bill of Attainder, and that Plaintiff cannot point to any indicia of punitive legislative intent behind the passage and implementation of the CDPAP amendments.  (Dkt. 20-12 at 44-47).  In its reply papers, Plaintiff does not argue that it has a likelihood of success on the merits for its Bill of Attainder claim.

The Constitution prohibits governmental action that imposes punishment without trial.  *See* U.S. Const. art. I, § 10, cl. 1 (Congress shall not "pass any Bill of Attainder").  The Supreme Court has identified three elements of an unconstitutional Bill of Attainder: "(1) 'specification of the affected persons,' (2) 'punishment,' and (3) 'lack of a judicial trial.'"  *ACORN v. United States*, 618 F.3d 125, 135-36 (2d Cir. 2010) (citation omitted).  As for punishment, the Court considers three factors: "(1) whether the challenged statute falls within the historical meaning of legislative punishment (historical test of punishment);

(2) whether the statute, 'viewed in terms of the type and severity of burdens imposed, reasonably can be said to further nonpunitive legislative purposes' (functional test of punishment); and (3) whether the legislative record 'evinces a [legislative] intent to punish' (motivational test of punishment)." *Id*. at 136. (citation omitted).

In the *Corning Council* case, the court determined that the amendments to Section 365-f did not constitute an unlawful Bill of Attainder. (*See* Dkt. 20-1 at 10-11). The court concluded that no specific entity was specified in the legislation, and that there was no intent to punish. (*Id*.). While the legislative history revealed that there was significant debate about whether moving to a single, statewide FI would lead to disruption of services, and there were some concerns about fraud, there were no specific complaints about any particular provider of FI services, nor was there any proof of legislative intent to punish providers of FI services. (*Id*.). The court further noted that there was a non-punitive purpose to the amendments to Section 365-f—that is, to reduce administrative costs, minimize service disruption, and reduce fraud and waste. (*Id*.). For the same reasons, the Court concludes that Plaintiff has failed to demonstrate a likelihood of success on the merits for its Bill of Attainder claim.

### D. The Balance of the Equities

"In a suit against the government, balancing of the equities merges into our consideration of the public interest." *SAM Party of N.Y. v. Kosinski*, 987 F.3d 267, 278 (2d Cir. 2021); *see also Team Kennedy v. Berger*, No. 1:24-cv-3897 (ALC), ___ F. Supp. 3d ____, 2024 WL 4144057, at *17 (S.D.N.Y. Sept. 10, 2024) (same). As noted by Defendants, public interest considerations associated with the performance of government

functions possess a high value when balancing the equities. *See, e.g.*, *United States v. Sang*, No. 21-cv-4266 (KAM)(CLP), 2022 WL 581012, at *11 (E.D.N.Y. Feb. 26, 2022) (granting preliminary injunction in favor of the government, and explaining that "[i]n weighing the balance of hardships, though Defendants will be restrained from making a living as federal tax return preparers, such harm is outweighed by the harm that would be imposed on the United States Government, Defendants' customers who are subjected to IRS audits and penalties, and public confidence in the federal tax system"). Here, even if Plaintiff could establish a likelihood of success, when balancing the equities between Plaintiff's potential pecuniary harm and the important interests articulated by Defendants—namely, reducing administrative costs, better oversight, and controlling fraud—the balance of the equities favors Defendants.

### III.    Motion for Extension of Time

Also pending before the Court is Defendants' motion for an extension of time to answer the complaint. (Dkt. 15). Plaintiff opposes the motion. (*See* Dkt. 15-1 at 2; Dkt. 19). On January 8, 2025, the Court issued a Text Order holding Defendants' deadline to answer the complaint in abeyance pending resolution of the motion for an extension of time. (Dkt. 16). Defendant's motion for an extension of time is granted, and Defendant shall file his answer or motion to dismiss within <u>21 days</u> of the issuance of this Decision and Order.

## **CONCLUSION**

For the foregoing reasons, Plaintiff's motion for a preliminary injunction (Dkt. 2) is denied. The Clerk of Court is directed to terminate the New York State Department of Health as a defendant to this action.

SO ORDERED.

_____
ELIZABETH A. WOLFORD
Chief Judge
United States District Court

Dated:  March 3, 2025
        Rochester, New York